# EXHIBIT 1

FILED
DALLAS COUNTY
3/27/2017 3:58:41 PM
FELICIA PITRE
DISTRICT CLERK

CAUSE NO. DC-16-16046

| | | |
|---|---|---|
| STEVEN CYR | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | 192nd JUDICIAL DISTRICT |
| | § | |
| ANDREW HILLMAN; SEMYON | § | |
| NAROSOV; MICHAEL AUSTIN: | § | |
| OPTIMIZED, INC., HEALTHCARE | § | |
| MARKETING, LLC; L2 SURGICAL, | § | |
| LLC; | § | |
| | § | |
| | § | |
| Defendants. | § | DALLAS COUNTY, TEXAS |

## **PLAINTIFF'S SECOND AMENDED PETITION**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, STEVEN CYR, Plaintiff, in the above-styled cause, and files this Second Amended Petition complaining of Defendants **ANDREW HILLMAN; SEMYON NAROSOV; OPTIMIZED, INC.; HEALTHCARE MARKETING, LLC; MICHAEL AUSTIN; and L2 SURGICAL, LLC (collectively "Defendants")** and for cause would show the Court as follows:

## **PRELIMINARY STATEMENT**

1.      Plaintiff Dr. Steven Cyr ("Plaintiff" or "Dr. Cyr") brings no claims in this lawsuit related to Forest Park Medical Center Dallas.  Dr. Cyr has never performed procedures at Forest Park Medical Center Dallas and has not referred patients to this facility.  Dr. Cyr has no ownership interest in Forest Park Medical Center Dallas.

2.      Andrew Hillman ("Hillman"), Semyon Narosov ("Narosov"), and Michael Austin ("Austin")   (referred to in this Petition as the "Individual Defendants") and their companies ("the Corporate Defendants") engaged in a tortious activity against Dr. Cyr.   Defendants

---

negligently drove Dr. Cyr's business ventures into the ground through mismanagement, including mismanaging relationships with various hospitals.

3.     Moreover, Defendants induced Dr. Cyr to invest with them in multiple different formats based on the promise that they were all partners and joint venturers, with the goal of creating a medical empire that they would eventually sell in a liquidity event for more than a billion dollars.   Defendants were also plotting to plunder the joint venture so that they could establish another business, Next Health, which excluded Dr. Cyr.    Dr. Cyr now brings this lawsuit to recover his damages resulting from the Defendants' tortious acts.

## DISCOVERY CONTROL PLAN

4.     Discovery shall be conducted under Level 3 pursuant to Rule 190.4 of the Texas Rules of Civil Procedure.

## PARTIES

5.     Dr. Cyr is an individual, citizen and resident of San Antonio, Texas and is and was a citizen of the United States of America at all times relevant to this lawsuit.

6.     Defendant OPTIMIZED, INC. is a Texas Corporation organized and existing under the laws of the State of Texas.  It is being served via its counsel of record.

7.     Defendant ANDREW HILLMAN ("Hillman") is an individual, citizen and resident of Dallas County, Texas.  He is being served through his counsel of record.

8.     Defendant HEALTHCARE MARKETING, LLC is a Texas Limited Liability Company organized and existing under the laws of the State of Texas. It is being served via its counsel of record.

9.     Defendant SEMYON NAROSOV ("Narosov") is an individual, citizen and resident of Dallas County, Texas.  He is being served through his counsel of record.

10. Defendant MICHAEL AUSTIN ("Austin") is an individual, citizen and resident of Dallas County, Texas. He is being served through his counsel of record.

11. Defendant L2 SURGICAL, LLC is a Texas Limited Liability Company organized and existing under the laws of the State of Texas. It is being served via its counsel of record.

12. On information and belief, Plaintiff believes and hereby alleges that at all times mentioned herein, each of the Defendants were the agents, employees, or partners of one or more or all of each of the other Defendants, and acted within the scope and authority of such agency, employment or partnership, and with the knowledge, consent, approval, and ratification of one or more or all of the other Defendants. Additionally, Hillman, Narosov and Austin aided and abetting each other in all of the conduct described below. Unless a particular Defendant is named, whenever this Petition references the acts of any Defendant or Defendants, such allegation shall be deemed to mean the acts of those Defendants named in the particular cause of action and each of them acting individually, jointly and severally. Hillman, Narosov and Austin committed the negligent conduct claimed herein in their capacities as officers, directors or principals of L2 Surgical.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction because Plaintiff seeks damages in excess of the Court's minimum jurisdictional limits.

14. Plaintiff seeks monetary relief of over $20,000,000.00.

15. Plaintiff expressly disavows any claims are being made pursuant to federal law, treaties, or constitutions. Although the amount in controversy exceeds $75,000, exclusive of costs and interest, there is a lack of complete diversity because Plaintiff and one or more of the

defendants are citizens of Texas. Any removal, or consent to removal, of this case to federal court would be improper.

16.     This Court has personal jurisdiction over the defendants because one or more of the defendants (1) are resident citizens of the State of Texas; (2) engaged in foreseeable, intentional, continuous, and/or systematic contacts within Texas; and/or (3) committed a tortious act made the basis of this action in Texas. Thus, there is both general and specific jurisdiction, and exercising jurisdiction over the defendants does not offend traditional notions of fair play and or substantive justice.

17.     Venue is proper in Dallas County, Texas pursuant to Tex. Civ. Prac. & Rem. Code §15.002(a)(1) and (2) because (1) all or a substantial part of the events or omissions giving rise to the claim occurred in Dallas County; and (2) one or more of Defendants are natural persons, and resided in Dallas County at the time this cause of action accrued and (3) one or more of Defendants principle places of business are in Dallas County.

## **FACTUAL BACKGROUND**

18.     This case is about the efforts of Dr. Cyr to grow his business and build a company that would be good for his family, partners  and  patients.  However, Defendants unethically and tortiously took advantage of Dr. Cyr's efforts and irrevocably harmed his career and livelihood.

**A.     Dr. Cyr**

19.     Dr Cyr served his country for 14 years as an Air Force officer. He began his career as a flight surgeon then underwent Orthopaedic residency training and was selected for spine surgery fellowship training at the Mayo Clinic. Dr Cyr continued serving on active duty as the chief of spine surgery and spine surgery consultant to the Surgeon General for the remainder of his Air Force career. He was a professor of Orthopaedic and spine surgery. Dr Cyr served two

tours of duty in Iraq during Operation Enduring Freedom caring for wounded combatants and civilian casualties. While active duty, he was awarded multiple distinctions including a meritorious service medal, before being honorably discharged. After serving his country, Dr Cyr began full-time civilian practice at The Orthopaedic & Spine Institute ("OSI"), of which he was the founder and president.  Dr, Cyr and his wife Le Ann are actively involved in charity efforts, including The Cyr Family Charitable Fund. Together, Dr. Cyr and Le Ann have been responsible for assisting charities in raising close to  $1,000,000 to assist those in need.

**B.    The Defendants**

20.    The Individual Defendants are men who have been involved in the healthcare industry for several years.  The Individual Defendants are not doctors, but instead form companies with doctors.   The Individual Defendants portray themselves as successful businessmen with expertise in setting up and managing businesses designed to assist physicians earn more income from their practices through legally vetted business investments.

21.    On information and belief, the Individual Defendants own and operate their various healthcare businesses through a layer of entities they own and control and identified collectively in this Petition as the "Corporate Defendants."  The Corporate Defendants are Optimized, Inc., Healthcare Marketing, LLC and L2 Surgical, LLC. Upon information and belief, Hillman is the sole owner of Optimized Inc. and Narosov is the sole owner of Healthcare Marketing LLC.   Hillman, Narosov and Austin own L2 Surgical LLC.   Hillman and Narosov and Austin are also owners of Next Health.   Next Health is not a party defendant. All of the defendants work together to enrich the Individual Defendants, Hillman, Narosov and Austin.

22.    The Individual Defendants distribute and/or re-sell certain medical equipment, devices and services (the "Ancillary Products and Services"), including surgical implants

(metals, and biologics), pharmacy, and toxicology. The Individual Defendants are Hillman, Narosov, and Austin.

23. The Corporate Defendants have overlapping ownership and officers. Most of the Corporate Defendants have the same business addresses in Dallas, Texas (either 5710 LBJ Freeway or 13601 Preston Road). Hillman and Narosov effectively control the Corporate Defendants, making themselves and/or their agents (specifically, Austin) officers and principals of the Corporate Defendants. Hillman and/or Narosov is an officer, director, or principal of L2, Optimized and Health Care Marketing LLC. Hillman and Narosov installed Austin as president of L2 and Optimized. The Individual Defendants directly and indirectly derive value, distributions, and funds from the other Corporate Defendants and other Corporate-related entities that are not named Defendants at this time.

**C.      The Defendants' Schemes.**

24. Prior to meeting the Individual Defendants, Dr. Cyr had been performing surgeries at Victory Hospital (previously Innova Hospital). Dr. Cyr had access to patients, connections, administrative contacts, medical knowledge and credibility that the Individual Defendants knew were crucial to making money selling their Ancillary Products and Services. The Individual Defendants saw this access, and approached Dr. Cyr about initiating a joint venture.

25. The Individual Defendants marketed the opportunity for ownership interests in companies offering the Ancillary Products and Services, and related companies. The Individual Defendants represented to Dr. Cyr that they could make money by various means, which all had a few things in common: the promise that Defendants would be partners with Dr. Cyr, that Defendants would look out for Dr. Cyr's interests, and that investing with the Individual Defendants would be the best possible place for Dr. Cyr's money. The Individual Defendants

promised that this joint venture would culminate in a liquidity event generating over a billion dollars.

26.     Based on these promises, Hillman and Dr. Cyr, pursuant to an oral agreement, formed a joint venture partnership, which Narosov and Austin eventually joined.   As partners, Defendants assured Dr. Cyr that they would agree to share in the profits, liabilities and decision making equally.

27.     Notably, the Individual Defendants promised Dr. Cyr that all aspects of the joint venture would be in full compliance with the law.  Defendants Hillman and Narosov claimed that the businesses were compliant with all federal and state statutes, and they represented to that they had a program in place to continually ensure compliance with all federal and state statutes. Hillman represented to Dr. Cyr that he spent over $400,000.00 to have former federal judges and attorneys ensure the company's compliance with all statutes and regulations. Hillman also represented to Dr Cyr that he had personally hired multiple former federal judges and US attorneys to work full-time in his companies to ensure compliance. Once Austin became the President of TSM he informed Dr. Cyr that he had assumed the responsibility for ensuring the compliance with all federal and state statutes.

28.     The compliance was a vital requirement for Dr Cyr who was very focused on performing business within the legal parameters required by both state and federal law.  This point was emphasized by Dr. Cyr, who had regularly consulted a healthcare attorney, to ensure he was compliant in all aspects of healthcare since 2008.   Additionally, Dr. Cyr and other physicians were assured that the companies in which Dr. Cyr and other physicians invested were set up in a way to avoid federal health beneficiary program business thus, ensuring compliance with Federal Stark regulations.  The Individual Defendants assured Dr. Cyr that this arrangement was fully compliant with the law and that fact was signed off on by "all the attorneys."

Additionally, the Corporate Defendants' legal counsel advised and represented to Dr. Cyr that all businesses were being formed and in compliance with both federal and state statutes. This was a part of Defendants' efforts to assure Dr. Cyr that they were taking care of his business interests. To that end, the Individual Defendants specifically informed Dr. Cyr that they would look out for his interests and protect those business interests in all aspects of the joint venture. There were numerous facets of this joint venture.

    i.    *Investing In Victory Hospital.*

29.    A crucial aspect of the joint venture was getting Dr. Cyr to invest time, resources and sweat equity into building Victory Hospital. Andrew Hillman represented to Dr. Cyr that he, Narosov and Austin, had the business expertise and experience in the medical industry in which they built physician businesses into multi-million dollar businesses. Dr .Cyr was specifically told Austin was solely responsible for a liquidity event in which he made $150 million dollars by selling Medical Edge for a 15 multiple of the company's EBITDA. Hillman claimed that a sale of Victory Hospital could be even greater.

30.    Hillman represented to Dr. Cyr that he wanted to go into business with him to grow Dr. Cyr's medical practice and Victory Hospital in a similar manner. Hillman spent considerable time convincing Dr. Cyr to invest in Victory and assured Dr Cyr the Victory franchise, with his assistance as a part owner at each facility and his recruitment of other physicians would ensure the system's success. He explained it would also become a $100 million dollar franchise with an enormous liquidity event that would be a good investment for Dr. Cyr and his family.

31.    The Individual Defendants represented to Dr. Cyr that the Partners would assist in the syndication and building of the Victory Hospital brand. They encouraged Dr. Cyr to recruit other surgeons to use their Ancillary Products. At all times they assured Dr. Cyr that the venture

was progressing successfully and they continued to implore Dr. Cyr to keep expanding his operation.

32.     Based on these promises, Hillman convinced Dr. Cyr to invest $1.7 million dollars in Victory.   Dr. Cyr devoted incredible resources to building Victory Hospital.  Dr. Cyr hired multiple doctors and staff to perform the medical work and staffing that Defendants represented would be necessary.   Dr. Cyr also purchased and leased expensive medical equipment and moved his business into a larger office at the urging of the Individual Defendants, who secretly just wanted Dr. Cyr to continue to build surgical volume for their own profit.   The Individual Defendants also induced Dr. Cyr to add these doctors and staff, and purchase this equipment, in order to build surgical volume for the same reasons.

33.     Moreover, at the urging of the Individual Defendants, Dr. Cyr also agreed to a joint marketing campaign to promote Victory Hospital to further try and expand the surgical volume.  Again, the Individual Defendants represented that greatly increasing the marketing was necessary, not aggressive, and that the investments in Victory Hospital were ensured of success given their experience.

34.     However, the representations made by the Individual Defendants were untrue, Victory fell apart as a direct result of mismanaged relationships and negligence.  Defendants were responsible for maintaining compliance for the entities that did business with Victory Hospital.  The Defendants' conduct was negligent.

35.     Dr. Cyr lost his 1,700,000 investment in Victory. Additionally, Dr. Cyr had $860,000 in his Victory capital account that was also lost when Victory filed bankruptcy.  Additionally, Victory's debtors pursued Dr. Cyr for the marketing debt that Victory could not pay.   Dr. Cyr was also exposed to liability because the Individual Defendants' false

representations caused Dr. Cyr to hire doctors and medical equipment that proved unnecessary. Dr. Cyr was also unable to pay the lease for his business.

36.     Dr. Cyr was also damaged by the Victory bankruptcy through exposure to unknown and unwarranted risks caused by the Individual Defendants, resulting in further potential damages and legal fees defending himself.

   ii.     *The Toxicology Clinics.*

37.     Another part of this joint venture was the Individual Defendants efforts to convince Dr. Cyr to invest in toxicology clinics. The Individual Defendants promised Dr. Cyr that his investment would yield millions in profits for investing with them, claiming that these types of businesses would definitely generate huge profits and distributions and/or will eventually be sold in a liquidity event. The Individual Defendants promised Dr. Cyr that no more than 40% of the owners of these toxicology clinics (and all the other businesses in the joint venture) would be owned by doctors like Dr. Cyr, while the Individual Defendants--or another of the Corporate Defendants under their control--would own, at a minimum, the 60% majority of each of the companies. Defendants assured Dr. Cyr that this setup was to assure compliance with the law. Defendants also assured Dr. Cyr that compliance with the law meant that Dr. Cyr could not participate in any control or management of these toxicology clinics. Instead, the Individual Defendants would maintain control of the companies investing in the toxicology clinics, and exclusively manage the companies. The Individual Defendants continually promised that they were looking out for the best interests of Dr. Cyr.

38.     Doctors like Dr. Cyr would be induced to invest in these toxicology clinics with the promise that the Individual Defendants that these businesses would be highly successful and produce guaranteed income streams. The Individual Defendants assured Dr. Cyr that the market

for these clinics was strong, that the Individual Defendants were fully familiar with this industry, and that the clinics were guaranteed to produce huge income streams.

39.     Based on these promises, Dr. Cyr invested in toxicology clinics.  Additionally, Dr. Cyr and his wife Le Ann worked vigorously to ensure these clinics were profitable by establishing connections with doctors in the local medical community.  As the toxicology business began to be profitable, Dr. Cyr believed that his hard work and investments were about to provide returns.

40.     However, the Individual Defendants were establishing other toxicology businesses that they would use to reduce and dilute Dr. Cyr's ownership interests.  Once Dr. Cyr had invested and given the Individual Defendants money, the Individual Defendants began to reduce his share in the toxicology clinics by using these competing businesses.   The Individual Defendants would also shift high overhead expenses into the original toxicology clinic investment.  This effectively destroyed the original toxicology clinic investment and bolstered the revenues and profitability of the new competing clinic.

41.     The Individual Defendants then promised that the new competing clinic had better revenues than the original investment.  Doctors like Dr. Cyr would be informed that the former toxicology clinic (and all its assets and revenues) would be merging with a new, allegedly more successful, clinic.  The original toxicology lab would be shut down.  Because of this "merger" the doctors (including Dr. Cyr's) ownership interest in the new clinic would only be a fraction of the ownership interest in the initial toxicology clinic.   Of course, there was no alternative, because the original toxicology clinic would be liquidated and run into the ground.

42.     This reduction effectively cut Dr. Cyr's ownership interest in toxicology clinic investments reducing his investment capital and his right to distributions.  For example, Dr.

Cyr's ownership interest one of the toxicology clinics was 20%, but was reduced to 10% when it "merged" with another toxicology clinic. Eventually, this new toxicology clinic was shut down after its successful revenue streams were funneled to another entity. Dr. Cyr's ownership interest in another toxicology clinic was 4%, but was reduced to approximately 1% in a second toxicology clinic. Eventually the new toxicology clinic was shut down after its successful revenue streams were funneled to another entity. The destruction of these benefits ruined relationships Dr. Cyr and his business had established in the local medical community.

43.     The Individual Defendants also negligently destroyed a relationship with a large insurance company. When this insurance company refused to allow its patients to receive insurance benefits at one of the toxicology clinics, the business dried up.

*iii. Investing in Vertelogic and TSM*

44.     TSM licensed and distributed surgical and medical instruments, equipment, and implants such as spinal implants to be used in doctors' surgeries. Vertelogic was formed by TSM to handle the administrative, sales, distribution and marketing of TSM's products for Dr Cyr. Initially, Dr. Cyr invested in and owned 40% of Vertelogic. At all times, Dr. Cyr had no involvement in the management operations of TSM or Vertelogic.

45.     The Individual Defendants wanted Dr. Cyr to invest in TSM, claiming that it would be a crucial part of their joint venture intended to sell or consign surgical products to hospitals and ambulatory surgical centers. The Individual Defendants represented that this joint venture between managerial experience and physician excellence would create quality products that can ultimately improve patient care due to efficient synergies. The Individual Defendants represented to Cyr that they had invested substantial amounts into carefully crafting a business plan for TSM to ensure compliance with federal statutes. They also represented to Dr. Cyr that

any business opportunities, partnerships or entities formed would be a part of and in furtherance of the TSM joint venture.

46.     Hillman told Dr. Cyr that together, with the other Individual Defendants, they would build and add on to TSM to make the joint venture into a multi-million-dollar healthcare enterprise. Hillman assured Dr. Cyr that TSM was the best place for Dr. Cyr to be a General Partner because TSM would be the final multi-million-dollar entity they would sell at a multiple of the EBITDA.  He described a potential liquidity event of five to fifteen times the EBITDA which he explained could easily be worth $1 billion dollars.

47.     Hillman assured Dr. Cyr that TSM's revenue would triple and it "would be a big deal for their families," especially because they had purchased a revolutionary product called Osteocrete.  Hillman represented that the enterprise owned Osteocrete, "It is our company," and that TSM had the exclusive distribution rights in over 15 states of half the population. Hillman's representations were designed to induce Dr. Cyr to put his faith in the Individual Defendants and their representations that TSM would be part of the financial empire they were building together.

48.     Based on Dr. Cyr's reasonable and material reliance on the Individual Defendants' representations regarding TSM, The Individual Defendants induced Dr.Cyr to trade 15% of his interest in Vertelogic plus invest another $500,000 for a 20% interest in TSM.

49.     Dr. Cyr focused on providing outstanding patient care though TSM, while Defendants allegedly focused on growing the business side of TSM joint venture. Dr. Cyr headed TSM's medical research and development. Austin was brought in as the President and CEO and he, along with Hillman and Narosov were to run the business side of TSM. Part of the business plan sold to Cyr was for Hillman to acquire intellectual property and to ultimately design Cyr's implants, and Hillman led Dr. Cyr to believe he was doing so.   However,

Hillman, Narosov and Austin neglected TSM and instead, contrary to their promises, focused on forming another enterprise, NextHealth, behind Dr. Cyr's back which excluded Dr. Cyr altogether.

50.     NextHealth was the actual company Defendants intended to grow into an enterprise, not TSM as was represented and promised to Dr. Cyr. All of the Defendants that were owners of TSM became owners of NextHealth—except for Dr. Cyr.  Austin, Narosov, and Hillman owned over 75% of NextHealth and shared stock with the rest of the Individual Defendants.

51.     The Individual Defendants were planning to push Dr. Cyr out after they had used him and TSM to build NextHealth. The Individual Defendants did not tell Cyr that NextHealth was the new face of enterprise.  Rather, they claimed it was simply a management entity for other businesses.  The Individual Defendants represented to the bitter end their enterprise with Dr. Cyr was still the vision and Dr. Cyr kept working for that vision.

52.     NextHealth slowly started to market and brand NextHealth as the face of their enterprise (excluding Dr. Cyr), the way the Individual Defendants promised to brand TSM but never did. Defendants also used TSM's revenues produced by the hard work of Cyr and funneled those revenues to NextHealth.   TSM's overhead began expanding but TSM's gross revenue was not. TSM was used to secretly pay the overhead expenses and legal fees of NextHealth and other entities controlled by the Individual Defendants.  The overhead of all of the Defendant's other entities, the executive salaries, and legal expenses, as well as multiple entities owned by the Defendants, who provided no additional services to TSM, were being paid by TSM in an effort to leech money out of Dr Cyr's hands. This was a way for Individual Defendants to use the money Dr. Cyr was generating for TSM, funnel it to NextHealth Enterprise and other companies owned by the Individual Defendants, and make those

companies look like the future million-dollar enterprise, all at the expense of TSM and their joint enterprise with Dr. Cyr.

53.     When Dr Cyr inquired about the company, he was assured the Defendants were "growing the company" for the eventual liquidity event that would generate millions. However, the Individual Defendants and other NextHealth owners were getting paid distributions from money generated by TSM.  Of course, this excluded Dr. Cyr because he did not have an ownership interest in NextHealth—this despite the fact that 40% to 60% of TSM's revenues were generated by surgical implants used in Dr Cyr's surgeries.

54.     Dr. Cyr should have been part of a growing company as promised. TSM would have been highly profitable had it not been for the funds siphoned to NextHealth and other companies owned by the Individual Defendants. The Individual Defendants hid from Dr. Cyr that TSM's expenses included large bonuses, lofty expenses, and private plane trips throughout the country and overseas for the Individual Defendants.  They also hid that the Individual Defendants were receiving inflated salaries from TSM and other personal expenses that were used for NextHealth's operations, rather than TSM.

55.     TSM stayed afloat for a while because of Dr. Cyr's hard work and practice as a surgeon. Dr. Cyr brought in 40-60% of TSM's revenue and around 80% of Victory Hospital's revenue. All along, Hillman assured Dr. Cyr that TSM was doing well and that the company they envisioned was growing. Dr. Cyr was also assured that TSM's high expenses and low profits were normal because of the huge growth TSM was achieving. Hillman repeatedly assured Cyr that TSM was still the company they would grow into a "100 million-dollar to 1 billion dollar company," and it was normal for TSM to have large expenses. However, Dr. Cyr was purposefully being kept in the dark.  Dr. Cyr was left out of all business meetings, executive decisions, summaries, and hiring/firing decisions.  Dr Cyr had no voting rights, was

not apprised of ANY decision-making, and was repeatedly ignored when Cyr asked for monthly accounting from TSM. This was all part of the Individual Defendants' plan to hide NextHealth and their failures from Dr. Cyr and hope that by convincing him to over-extend his practice, he could make up for their shortcomings with a heavy surgical volume, all while excluding him from the real investment in NextHealth.

56. Dr Cyr continued to believe Hillman, Narosov, and Austin were working towards the future growth and success of TSM. Cyr was repeatedly assured they were "business experts" who "knew what they were doing" and one day everyone would benefit. Dr Cyr trusted that Hillman, Narosov, and Austin were compliant, honest, loyal, and forthright. Accordingly, he continued to heavily invest his time, money and resources in the joint venture.

57. Shortly thereafter, the Individual Defendants closed Vertelogic without warning, fired all the surgical representatives in San Antonio, and told Cyr that both Vertelogic and TSM were worth nothing. It was also discovered that the "revolutionary product", Osteocrete, that the Individual Defendants claimed was added to the company's portfolio was, in fact, owned by Next Health, a company jointly owned by the Defendants excluding Cyr, and not TSM.

58. Clearly TSM was not the best place for Dr. Cyr because, contrary to the Individual Defendants' representations, they were focused on building Next Health, not TSM. TSM was merely the vessel the Individual Defendants used to isolate Dr. Cyr form the Individual Defendants' decision-making, profits, and future financial growth. Defendants were lying all along and Dr. Cyr's $500,000, along with the 15% he gave up in Vertelogic stock were rendered worthless by the Individual Defendants' tortious acts.

59. When Defendants alleged that **TSM was the best place for Cyr to be a General Partner,** this was a lie. In reality, it was actually the **best for Defendants to keep him isolated**, allowing the Defendants to use him to generate revenue and pay him nothing.

The plan was for NextHealth to bleed Dr. Cyr and TSM dry.  The lesson was clear:  "Thanks Dr. Cyr for building NextHealth for us, see you later, we are going to continue to build NextHealth now and then sell it instead of TSM. By the way, the companies you invested all your time and family's money in is worth nothing."

**D.      The Fallout and Dr. Cyr's Damages**

60.      Dr. Cyr and his personal company, OSI, was suffering through all of this. In the first full year of business, an accrual accounting mistake by Defendants caused Dr. Cyr to make a $1.5 million overpayment on taxes. Dr. Cyr had to take out a $750,000 promissory note to cover OSI expenses when Victory fell apart, of which approximately $350,000 is still owed.

61.      Once defendants had bled Dr. Cyr, OSI was all that Dr. Cyr had left and it continued to suffer. Victory debtors pursued OSI for marketing debt that Victory built and then was dropped on OSI after Victory crashed.   In addition, because Defendants had induced Dr. Cyr to overextend his company based on the false representations that they were building up TSM and Victory, Dr. Cyr suffered tremendous losses.  These included costs associated with hiring excess doctors and staff, in addition to overextending on leases for equipment and space.

62.      Dr. Cyr and his family continue to suffer. Thus far, they have paid over hundreds of thousands of dollars in attorney's fees for lawsuits filed against them as a result of being forced to vacate their lease and are still at risk of owing millions. Defendants are responsible for fully indemnifying Dr. Cyr for each and every lawsuit and liability exposed to Dr. Cyr.  OSI, Dr. Cyr, and his family's reputation in the community, has suffered.  They have been put through the ringer and lied to by defendants in every way possible.  This financial disaster has even led the Cyrs to cash out their 401k plans and even college savings plans they created for their children.

63.      Dr. Cyr also lost more than $3,000,000 invested in TSM and Victory.

64.     Dr. Cyr has also lost all the money and sweat equity he invested in the toxicology clinics.  The amount of his damages for this exceeds $1,000,000.

65.     Dr Cyr was informed by TSM and NextHealth's CFO that the abrupt closure of Vertelogic and the San Antonio market was purely the result of lack of profitability, when in fact; it was the most profitable branch of the TSM Enterprise.  Shortly after Vertelogic was shutdown, Dr. Cyr discovered for the first time that Defendants were diverting profits of TSM and Vertelogic to their other companies.

66.     Additional internal records show that Defendants performed services and committed acts that have wrongfully exposed Dr. Cyr to liability.

67.     Dr. Cyr's total damages are expected to exceed $20,000,000, exclusive of attorneys' fees.

## CAUSES OF ACTION

### COUNT 1:  FRAUD, FRAUD BY OMMISSION, FRAUD BY CONCEALMENT, FRAUD BY MISREPRESENTATION, AND FRAUD IN THE INDUCEMENT

68.     Plaintiff re-alleges each and every one of the foregoing paragraphs as though set forth fully herein.

69.     Defendants fraudulently informed Dr. Cyr that TSM and Victory Hospital were part of a joint venture by which they were create successful businesses that would be sold in a liquidity event.   Rather, these businesses were merely used to keep Dr. Cyr in the dark. Defendants fraudulently informed Dr. Cyr that he should create large surgical volume and work endless hours to benefit the joint venture.   Defendants fraudulently failed to disclose to Dr. Cyr that Defendants set up NextHealth and other companies as joint venture partnerships and diverted profits and resources from TSM. Defendants represented to Dr. Cyr that Dr. Cyr's ownership interests in any future business developed were protected through Dr. Cyr's

ownership interests in TSM and Vertelogic. Defendants also informed Dr. Cyr  he would be treated as a true partner in the toxicology clinics.  Defendants failed to disclose to Dr. Cyr that they would establish competing toxicology clinics that would compete, and would eventually be used to dilute his shares.   Defendants failed to disclose that Dr. Cyr would be diluted from these toxicology clinics and eventually shut out unless he referred patients.  Defendants failed to disclose that they would use other toxicology clinics to divert revenue streams away from the toxicology clinics that Dr. Cyr invested in.  Defendants further failed to disclose that they would negligently bill and/or overbill services to the toxicology clinics and Victory Hospital.

70.     Defendants further made material misrepresentations to Dr. Cyr, stating that they would build and develop TSM and any future business ventures would be part of TSM. Defendants' made multiple representations to Dr. Cyr that Defendants' conduct, actions, business dealings, marketing efforts, and development of TSM were a joint effort to develop and grow TSM and the other related entities in the joint venture.

71.     Additionally, Defendants' falsely represented to Dr. Cyr in the following, but not limited to, ways:

- Trading 15% of Dr. Cyr's interest in Vertelogic plus an additional $500,000 for 20% interest in TSM was the best position for Dr. Cyr as a general partner and would be critical to establishing a future liquidity event.

- Representing that they were focused on building TSM as a critical piece of the joint venture.

- Representing that TSM and Vertelogic were being operated in full compliance with all federal and state statutes and had a compliance program in place to ensure that TSM and Vertelogic were properly formed, managed, and operated.

- Representing that TSM would triple the revenue of Vertelogic and it would be a big deal for their families

- Representing that TSM was the company the partners would grow together into a billion dollar company.

- Representing that Defendants were properly handling and managing the business side of TSM in the best interest of the joint venture and Dr. Cyr.

- Representing that the the company the partners were growing would include Victory, OSI, TSM and Vertelogic.

- Assuring Dr. Cyr that TSM acquired a new product that would triple its revenue, and upon investigation, it turns out that NextHealth purchased the new product.

- Representing that Dr. Cyr would be included in communications, meetings and executive decisions.

- Representing that Hillman was trying to acquire intellectual property for the benefit of TSM, Dr. Cyr, OSI and Vertelogic when he was really off forming NextHealth with the defendants.

- Representing that Dr. Cyr would be included in the communications between the executives of TSM and Victory.

72.     Defendants' representations and failure to disclose material facts were material misrepresentations. Defendants made these representations when they knew or should have known that they were false and/or asserted them without knowledge of their truth. Defendants intended for Dr. Cyr to rely and act upon these omissions and representations and Dr. Cyr reasonably and justifiably relied on these representations as described above. As a result of Dr.

Cyr's reliance upon Defendants' omissions and misrepresentations, Dr. Cyr suffered monetary damages for which he now sues.

## COUNT 2: BREACH OF FIDUCIARY DUTIES

73.　　Plaintiff re-alleges each and every one of the foregoing paragraphs as though set forth fully herein.

74.　　The Defendants owed fiduciary duties to Dr. Cyr.　The Defendants breached the following fiduciary duties owed to Plaintiff:

- the duty of loyalty and utmost good faith;

- the duty of candor;

- the duty to act with integrity of the strictest kind;

- the duty of fair, honest dealing;

- the duty of full disclosure;

- the duty of good faith, fair dealing, loyalty, and fidelity;

- the duty of full disclosure on all matters affecting Plaintiffs; and,

- the duty of utmost good faith, fairness, and honesty in dealing with Plaintiffs.

75.　　The breaches of fiduciary duty by Defendants, as set forth in the factual allegations above, resulted in injuries to Plaintiff.

## COUNT 3: CONVERSION AND CIVIL THEFT

76.　　Plaintiff incorporates each of the foregoing paragraphs by reference as if fully set forth herein verbatim.

77.　　Dr. Cyr was entitled to distributions as a result of his ownership interest in TSM and Vertelogic.　The Defendants did not properly make distributions to Dr. Cyr for his

ownership interests. The Defendants wrongfully exercised dominion and control over the property.

78.    Dr. Cyr has suffered injury as a result of Defendants' conduct for which Dr. Cyr now bring this suit. Dr. Cyr seeks recovery of his actual and consequential damages, costs, interest, and exemplary damages.

79.    Further, the Defendants intentionally and willfully stole Dr. Cyr's money.  This property is the sole and exclusive property of Dr. Cyr.  Dr. Cyr has an exclusive right to possession and distribution of such property, which is valuable to Dr. Cyr and vital to Dr. Cyr's continued business operations. Dr. Cyr never consented to the stealing of his money. The Defendants have been in knowing and unauthorized possession and control of such property.

80.    Since that time, at the latest, Defendants may have been obtaining unjust and substantial benefit from the Dr. Cyr's property to third parties without the Dr. Cyr's consent and without paying Dr. Cyr for the value of such property.  The Defendants' improper assumption and exercise of dominion and control over Dr. Cyr's property has and will continue to interfere with and diminish the Dr. Cyr's rights in that property. Allowing Defendants to retain the benefits received as a result of their wrongful acts would unjustly benefit Defendants at Dr. Cyr's expense.

81.    As a direct and proximate result of Defendants' actions, Dr. Cyr has lost, and will continue to lose, profits from potential purchasers of Dr. Cyr's services in an amount to be determined at trial. The Defendants' wrongful conduct was a substantial factor in causing this harm.  Dr. Cyr is entitled to an award of the value of the property taken, with interest, and other damages in an amount to be proven at trial. In addition, or in the alternative, Dr. Cyr is entitled to damages and repossession of the converted property. In addition, or in the alternative, Dr.

Cyr is entitled to restitution of the Defendants' ill-gotten gains. Dr. Cyr will seek his election of remedies at trial.

## COUNT 4: QUANTUM MERUIT

82.     Plaintiff incorporates each of the foregoing paragraphs by reference as if fully set forth herein verbatim.

83.     Pleading in the alternative, Defendants are liable in quantum meruit to Dr. Cyr for the customary and reasonable value of service provided by Dr. Cyr for his efforts in enhancing the value of TSM.   Dr. Cyr spent years researching and developing products, developing marketing and business strategies for the TSM business and performed a valuable service to the Defendants, and Defendants as such, accepted such services under circumstances which give notice that Dr. Cyr should be paid for as long as Defendants are benefiting from such services.   Dr. Cyr therefore sues in the alternative for the reasonable value of the services provided to Defendants.

## COUNT 5: CIVIL CONSPIRACY

84.     Plaintiff incorporates each of the foregoing paragraphs by reference as if fully set forth herein verbatim. The Defendants have engaged in a conspiracy to convert Dr. Cyr's monies. The Defendants had a meeting of the minds to steal the Dr. Cyr's money as set forth above by .inducing him to invest time, money and sweat equity into various businesses with the intent to eventually dilute or divest his interests. The Defendants committed an unlawful, overt act to further their object or course of action. Dr. Cyr has suffered injury as a proximate result of the wrongful acts, for which Dr. Cyr now brings this suit, seeking recovery of its actual damages and exemplary damages.     Further,   the   Defendants   willfully,   intentionally,   and knowingly agreed and conspired with each other to engage in the alleged wrongful conduct.

85.     As a direct and proximate result of the acts in furtherance of the conspiracy, Dr.

Cyr has suffered injury, damage, loss, and harm. The Defendants' intentional agreement to commit, and commission of, these wrongful acts was willful, malicious, oppressive, and in conscious disregard of Dr. Cyr's rights, and Dr. Cyr is therefore entitled to an award of punitive damages to punish their wrongful conduct and deter future wrongful conduct.

## COUNT 6: UNJUST ENRICHMENT

86.     Plaintiff incorporates each of the foregoing paragraphs by reference as if fully set forth herein verbatim.

87.     The Defendants obtained funds and profits from Dr. Cyr by fraud and the taking of undue advantage of Dr. Cyr in the manners set forth above. The Defendants unjustly received benefits at the expense of Dr. Cyr through their wrongful conduct, including Defendants' interference with the Dr. Cyr's business relationships and other unfair business practices.

88.     The Defendants continue to unjustly retain these benefits at the expense of Dr. Cyr. Dr. Cyr is entitled to full restitution of all amounts in which Defendants have been unjustly enriched at the Dr. Cyr's expense. Said actions of the Defendants give rise to a cause of action on behalf of Dr. Cyr under the equitable remedy of unjust enrichment, which cause of action is hereby stated.

## COUNT 7: AIDING AND ABETTING

89.     Plaintiff incorporates each of the foregoing paragraphs by reference as if fully set forth herein verbatim. In the alternative, if the same if necessary, Defendants assisted, encouraged, advised, participated and/or instigated Defendant Hillman to breach his fiduciary duty and other tortious acts with respect to Dr. Cyr. Defendants are joint and severally liable as a result of aiding and abetting.

90.     Defendant conduct of fraud and breach of fiduciary duty are primarily tortious acts. Defendants provided substantial assistance to Hillman in accomplishing the tortious conducts. Therefore, Defendants' own conduct separate from the conduct of Hillman was a breach of duty to Dr. Cyr.  Defendants' participation was a substantial factor in causing the tort.

### COUNT 8: VIOLATIONS OF TEXAS THEFT LIABILITY ACT

91.     Dr. Cyr incorporates each of the foregoing paragraphs by reference as if fully set forth herein verbatim.

92.      Dr. Cyr had a possessory right to the fair market value of the compensation he earned through his performance according to agreements. The unlawful taking was made with the intent to deprive Dr. Cyr of his property. Dr. Cyr has sustained damages as a result of the theft for which he now brings this suit seeking actual and consequential damages, interest, costs, and exemplary damages as well as statutory damages.

### COUNT 9: NEGLIGENCE AND GROSS NEGLIGENCE

93.     Plaintiff re-alleges each and every one of the foregoing paragraphs as though set forth fully herein.

94.     The Defendants owed and still owe duties to Dr. Cyr. The Defendants breached these duties which proximately caused damages to Dr. Cyr.  As a proximate result of the Defendants' negligence Dr. Cyr has been damaged.

### DAMAGES

95.     The actual amount of damages sought by Dr. Cyr are within the jurisdictional limits of this Court, including any punitive damages inclusive of reasonable attorney's fees, or as may be awarded by the jury in its deliberation after the hearing of evidence in this case.

96.     Dr. Cyr is also entitled to damages against Defendants for disgorgement of all profits as a result of the breach of fiduciary duties and conspiracy.

97.      Dr. Cyr is entitled to a full accounting.

98.      Dr. Cyr is entitled to attorney fees.

## **CONSTRUCTIVE TRUST**

99.      Dr. Cyr is entitled to distribution of funds wrongfully held by one or more of the Defendants. Dr. Cyr has no adequate remedy at law to compensate him for not being provided with stock and/or other ownership interest in the Defendants entities, including NextHealth. The precise extent of the value of such interest necessarily depends on future events that are not yet ascertainable. Dr. Cyr is entitled to money in possession of one or more of the Defendants and, as that money belongs to Dr. Cyr, a tracing of that money to particular funds or property in one or more of the Defendants possession, and which funds arouse from Dr. Cyr's interest in partnership with Defendants. Dr. Cyr is therefore entitled to an order barring Defendants from disbursing the disputed funds, interest, stock, and profits and requiring Defendants to hold those funds, interest, stock, and profits in trust for Dr. Cyr's benefit.

## **ATTORNEY FEES**

100.     Dr. Cyr is compelled to employ the services of the attorneys at Fee, Smith, Sharp, and Vitullo to file this action and thus seeks recovery of all damages, relief, and attorney fees and costs expended. Pursuant to TEX. CIV. PRAC. & REM. CODE § 37.009 and § 38.001 *et seq*., Dr. Cyr seeks to recover the reasonable amount of attorneys' fees incurred by reason of the Defendants' conduct

## **CONDITIONS PRECEDENT**

101.     All conditions precedent to Dr. Cyr's right of recovery have been performed, have occurred or have been waived.

## **JURY DEMAND**

102.     Plaintiff hereby demands a jury trial for all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Dr. Cyr respectfully requests this Court to assume jurisdiction of this cause and that:

Defendants be cited to appear and answer Dr. Cyr's complaints and that upon final trial, Dr. Cyr have and recover his damages as alleged herein, plus punitive damages inclusive of attorney's fees, attorney's fees as a separate recovery, pre-judgment interest, post-judgment interest, special damages, consequential damages, lost profits, lost investment income,  costs, that a constructive trust be imposed as requested and that Dr. Cyr have and recover such other and further relief at law or in equity, general or special, to which Dr. Cyr may show himself justly entitled.

Respectfully submitted,

**FEE, SMITH, SHARP & VITULLO, L.L.P**

Anthony L. Vitullo
State Bar No. 20595500
Jon Azano
State Bar No. 24031835
Three Galleria Tower
13155 Noel Road, Suite 1000
Dallas, Texas 75240
(972) 934-9100 Telephone
(972) 934-9200 Facsmile
lvitullo@feesmith.com
jazano@feesmith.com

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

       This is to certify that a true and correct copy of the above and foregoing document has been served on all counsel of record on March 27, 2017, in accordance with the Texas Rules of Civil Procedure to:

Lynette S. Byrd
Haroon Hashmi
The Oberheiden Law Group, PLLC
5728 LBJ Freeway, Suite 250
Dallas, TX 75240
*(972) 559-3365 Facsimile*
lsb@federal-lawyer.com
hfh@federal-lawyer.com
***Attorneys for Defendants***

_____
Jon D. Azano