**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: July 16, 2019.**

_Craig A. Gargotta_

_____
**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **STEVEN JEFFREY CYR** | § | **CASE No. 18-50102-CAG** |
| | § | |
| | § | **Chapter 7** |
| Debtor. | § | |

**ORDER SUSTAINING IN PART, OVERRULING IN PART, AND MOOTING IN PART, AMENDED OBJECTION OF JOSE C. RODRIGUEZ, TRUSTEE, TO DEBTOR'S CLAIMS TO EXEMPTIONS (ECF NO. 182), SUSTAINING IN PART, OVERRULING IN PART, MOOTING IN PART, AND DENYING IN PART FIRST, AMENDED OBJECTION OF KEY EQUIPMENT FINANCE TO DEBTOR'S CLAIMS OF EXEMPTIONS (ECF NO. 183), AND SUSTAINING IN PART, AND OVERRULING IN PART SNH NS MTG PROPERTIES 2 TRUST'S AMENDED OBJECTIONS TO THE DEBTOR'S CLAIMS OF EXEMPTIONS (ECF NO. 184)**

Came on for hearing Amended Objection of Jose C. Rodriguez, Trustee, to Debtor's Claims to Objections (ECF No. 182) ("Trustee's Objection"), First Amended Objections of Key Equipment Finance to Debtor's Claims of Exemptions (ECF No. 183) ("Key's Objection"), and SNH NS MTG Properties 2 Trust's Amended Objections to Debtor's Claims of Exemptions (ECF No. 184) ("SNH's Objection") (collectively, the "Objections"). Steven Jeffrey Cyr ("Debtor")

1

filed Debtor's Response to Objections to Debtor's Exemptions (ECF No. 194) ("Debtor's Response") and LeAnn Cyr, individually and as the wife of Debtor, ("LeAnn") and as Trustee of the Steven and LeAnn Cyr Living Trust filed her Omnibus Response to Objections to Debtor's Exemptions (ECF No. 193) ("LeAnn Cyr's Response"). The Court set the Objections for hearing, the Parties each appeared through counsel and presented argument, and the Court took the matters under advisement. After considering the evidence, arguments made and the briefing of counsel, as well as the file and record in the case, the Court finds that the Trustee's Objection is SUSTAINED IN PART, OVERRULED IN PART, and MOOTED IN PART, Key's Objection is SUSTAINED IN PART, OVERRULED IN PART, MOOTED IN PART, and DENIED IN PART, and SNH's Objection is SUSTAINED IN PART, and OVERRULED IN PART.

## JURISDICTION

This Court has jurisdiction over the Objections pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(A) (administration of the estate) and (B) (allowance or disallowance of claims of exemptions from property of the estate). Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

## PROCEDURAL BACKGROUND

On January 20, 2018 (the "Petition Date"), Debtor filed bankruptcy under chapter 7 of the Bankruptcy Code (ECF No. 1). The Chapter 7 Trustee appointed in this case is Jose C. Rodriguez. Debtor's § 341 meeting was held and concluded on February 15, 2018. On March 5, 2018, Debtor amended his Schedule A/B and Statement of Financial Affairs ("SOFA") (ECF No. 18). On February 7, 2019, Debtor again amended his Schedules A/B and C and his SOFA (ECF No. 185). On the eve of the hearing, February 12, 2019, Debtor amended his Schedules A/B and C and his SOFA for a third time (ECF NO. 195).

Key noticed the examination of Debtor pursuant to Federal Rule of Bankruptcy Procedure 2004 by Amended Notice dated April 5, 2018. Likewise, Key noticed the examination of LeAnn in her capacity of the Trustee of the Bergerud Heritage Trust ("BHT")[1] by subpoena dated April 5, 2019. The Rule 2004 Examinations of Debtor and LeAnn were conducted pursuant to Court Order over a three-day period—January 29, 2019 through January 31, 2019. In anticipation of the 2004 Examination, on January 28, 2019, Debtor and LeAnn delivered to the Court a privilege log containing a number of emails and files asking the Court to determine whether such communications were protected by attorney-client privilege. On January 30, 2019, the Court evaluated the communications and entered its *Sua Sponte* Order Regarding Communications and Documents Provided for In-Camera Inspection (ECF No. 180). In its Order, the Court identified which communications and it deemed privileged, and ordered Debtor and LeAnn to produce the communications not identified in the Order. Key contends, and neither Debtor nor LeAnn dispute, that despite this Court's Order, no party-in-interest in attendance at the 2004 examinations was permitted to examine either Debtor or LeAnn regarding the unprivileged communications that such communications were withheld until after the conclusion of the 2004 examinations. (ECF No. 183).

## TRIAL AND EXHIBITS

The Court conducted a four-day bench trial on the Objections before taking the matter under advisement. Trial concluded on  March 7, 2019, and the Court permitted the Parties to submit written closing arguments by April 1, 2019. The Court admitted Joint Exhibits 1–35,[2] 36–39, 41–

---

[1] The BHT is a spendthrift trust created on November 2, 2009. The BHT and various transfers made to the BHT are the subject of adversary proceeding number 18-05227.

[2] Joint Exhibit 35 was admitted only as to authenticity.

43, 72–75, 77, 79, 91, 93, 94, and 96 by stipulation of the Parties. The Court also admitted the following exhibits: Joint Exhibits 44, 45, 46, 49, 50, 56, 58, 60, 64, 66, 68, 69, 70, 71, 78, 80, 84, and 88; Key Exhibits 100, 101, 102, 103, 104, 105, 114, 115, 119, 122, 123, 124; SNH Exhibits 97, 98, 116, and 120; Trustee Exhibits 99, 111, 112, and 113; and Cyr Exhibits 108, 109, 118, and 125.

## WITNESSES AND CREDIBILITY

### 1. Dr. Steven J. Cyr, Debtor

Debtor testified regarding his background. Debtor's father was in the military and, having moved five or six times, he grew up in multiple locations. Debtor lived in San Antonio from the age of six to the age of ten. His father was reassigned to the Philippines where Debtor attended middle school and most of high school on an Air Force base. During his senior year of high school (1988), Debtor's father retired from the United States Air Force (the "Air Force") and Debtor and his family moved back to San Antonio.

Debtor graduated from high school in San Antonio and attended Southwest Texas State University on an academic scholarship. In 1992, Debtor received early acceptance to medical school at the University of Texas Health Science Center, San Antonio and graduated in 1996. Debtor attended medical school on an Air Force scholarship, and upon graduation from medical school, Debtor entered active duty service as a captain and spent fourteen years in the Air Force.

While in the Air Force, Debtor was stationed in San Antonio. Debtor was a flight surgeon for two years. After completion of his orthopedic residency training at Wilford Hall in San Antonio, Debtor became the sole spine surgery commander for the Air Force until he separated from the Air Force in 2010. During his time in the Air Force, Debtor served two tours of duty in Iraq—the first in 2006 and the second in 2009. Debtor served as a professor of orthopedic surgery and spine

surgery and a commander of that department. Debtor was a consultant to the Surgeon General and the Pentagon for spine surgery. Debtor also trained residents and medical students from the medical school in Bethesda, Maryland. Beginning in 2004, Debtor worked off base to maintain and build proficiency of his spine training. In early 2006, Debtor began seeing patients. Between the years of 2004 to 2010, Debtor maintained multiple jobs at the same time—his active duty job in the Air Force, consulting work where he helped design implants, medical work for the Worker's Compensation Commission, and work in private practice. Debtor was discharged from the Air Force in 2010 and separated with the rank of Lieutenant Colonel. Debtor and LeAnn were married in 1999. Together, they have four children— a 16-year-old daughter, 13-year-old son, 8-year-old son, and a 3-year old daughter.

Debtor testified regarding involvement in his family's finances. He also testified about what property he included and did not include on his schedules, and why he filed multiple amendments to his schedules. Debtor testified about his connections to San Antonio and his intent to claim 15 Esquire, San Antonio, Texas ("15 Esquire") as his homestead. Debtor testified regarding communications with a real estate agent related to 15 Esquire and his intentions regarding whether to list 15 Esquire for sale. Debtor also testified regarding the reasons for purchasing 30 Post Shadow, Spring, Texas ("30 Post Shadow") various communications with individuals regarding the purchase of 30 Post Shadow and his plans to practice in Houston. He also testified about various school applications made for his children to attend schools in Houston. Debtor explained why he wanted to practice in Houston and described the difference between the Houston market and San Antonio market as it relates to his profession. Debtor testified as to his monthly income and expenses. He testified about Orthopedic Spine Institute, LLC ("OSI") and SASpine, LLC ("SASpine") and his role in the two entities. Debtor testified about various insurance policies he

claimed as exempt. Debtor testified about his personal property, the monetary values he ascribed to such property, and his involvement in the appraisal of his personal property. Debtor also testified regarding his 401(k) and receipt of the 401(k) proceeds. Debtor also testified regarding the Steven & LeAnn Cyr Living Trust (the "Living Trust") and his previous role as a trustee of the Living Trust.

Pending in this Court are three adversary proceedings filed in Debtor's bankruptcy case: (1) ***Rodriguez v. Bergerud Heritage Trust et al***, adversary proceeding number 18-50227 (complaint to avoid transfers); (2) ***Key Equipment Finance, a division of KeyBank Nation v. Cyr et al***, adversary proceeding number 19-05008 (complaint to avoid transfers under Texas Uniform Fraudulent Transfer Act, determine dischargeability of a particular debt under 11 U.S.C. §§ 523(a)(2)(A) and (a)(2)(B),[3] deny Debtor's discharge pursuant to § 727(a)(2)(A), and render judgment for the amount of the liquidated prepetition debt); and (3) ***SNH NS MTG Properties 2 Trust v. Cyr***, adversary proceeding number 19-05009 (complaint to deny Debtor's discharge pursuant to §§ 727(a)(2) and (a)(4)). The litigation in these adversaries is in their early stages. Based on the nature of the complaints, the Court anticipates that credibility will be a significant factor in determining the merits of the adversary proceedings. Moreover, the issues presented in the Objections can be determined as a matter of law without considering Debtor's credibility. Therefore, the Court abstains from making a credibility determination of Debtor at this time.

**2. LeAnn Cyr**

LeAnn is Debtor's wife. LeAnn testified regarding her educational and professional background, including her role at OSI and SASpine. LeAnn confirmed that she does not have a

---

[3] All references to U.S.C. refer to 11 U.S.C. *et. seq.* unless otherwise specified herein.

law degree. LeAnn testified regarding the Living Trust and why Debtor resigned as a trustee. She also testified regarding her involvement in the completion of Debtor's bankruptcy schedules. She testified regarding the reasons for the purchase of 30 Post Shadow and various communications related to its purchase. LeAnn testified regarding Debtor's 401(k) plan and receipt of the 401(k) proceeds. LeAnn testified about communications with a real estate agent related to 15 Esquire and her intentions regarding whether to list 15 Esquire for sale. LeAnn testified about various personal financial statements she and Debtor completed during the years of 2014 through 2017. She testified regarding the mortgage on 15 Esquire and the payment of monthly expenses for the Cyr family. She testified regarding her connections to San Antonio and intentions to stay in San Antonio. LeAnn testified regarding her involvement in the appraisal of the personal property located at 15 Esquire.

As previously mentioned, pending in this Court are three adversary proceedings filed in Debtor's bankruptcy case, two of which LeAnn is a named defendant. Based on the nature of the complaints, the Court anticipates that credibility will be a significant factor in determining the merits of the adversary proceedings. Moreover, the issues presented in the Objections can be determined as a matter of law without considering LeAnn's credibility. Therefore, the Court abstains from making a credibility determination of LeAnn at this time.

### 3. Anthony Vitullo

Anthony Vitullo represented Debtor and LeAnn[4] in a lawsuit against certain investors (the "Hillman Litigation"). Vitullo testified regarding how he came to know the Cyrs, his representation of the Cyrs in the Hillman Lawsuit, strategic decisions he made during his representation, and the

---

[4] Whether or not Vitullo represented persons other than Debtor and LeAnn is not before the Court and at this time, the Court takes no position on the issue.

ultimate settlement reached. The Court finds Vitullo to be a credible witness.

### 4. Norbert Gonzalez

Norbert Gonzalez ("Gonzalez") is the Cyrs' CPA and at times, serves as their attorney regarding corporate matters. Gonzalez also serves as the Trust Advisor for the BHT. Gonzalez testified regarding the formation of OSI and SASpine. Gonzalez also testified regarding his understanding for the reasons that Debtor resigned as trustee of the BHT. The Court finds Gonzalez to be a credible witness.

### 5. Lillian Putman

Lillian Putman ("Putman") performed an appraisal on Debtor's personal property that Debtor ultimately adopted and used for purposes of assigning values to his personal property exemptions (the "Putman Appraisal"). Putman holds a certified general Texas Appraiser's License. Putman testified regarding her experience at the Cyrs' home when she conducted the appraisal, the process she employed to appraise Debtor's personal property, and the strengths and weaknesses of her appraisal. The Court finds Putman to be a credible witness.

## DISCUSSION

### I. Legal Analysis

### A. Property of the Estate and Exemptions Generally

Under § 541(a), the commencement of a bankruptcy case creates a bankruptcy estate comprising of, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case." "The debtor may then remove certain types of property from the estate by electing to take advantage of exemptions described in federal or state law." ***Hawk v. Engelhart (In re Hawk)***, 871 F.3d 287, 290 (5th Cir. 2017) (citing 11 U.S.C. § 522(b) (West 2012)). "An exemption is an interest withdrawn from the estate (and hence from the creditors) for

the benefit of the debtor. *Id.* (quoting *Owen v. Owen*, 500 U.S. 305, 208 (1991)).

## B. Burden of Proof

A debtor must file a list of property claimed as exempt on the debtor's schedule of assets. Fed. R. Bankr. P. 4003(a). "A party in interest may file an objection to the list of property claimed as exempt within 30 days after the meeting of creditors . . . is concluded or within 30 days after any amendment to the list or supplemental schedules is filed, whichever is later. *Id.* 4003(b). "Unless a party in interest objects, the property claimed as exempt . . .  is exempt" and as a result, the property claimed as exempt is not part of the bankruptcy estate. 11 U.S.C. § 522(*l*); *In re Hawk*, 871 F.3d at 290.

In any hearing on an objection to a claim of exemption, "the objecting party has the burden of proving that the exemptions are not properly claimed." Fed. R. Bankr. P. 4003(c). "Such burden is by a preponderance of the evidence." *In re Shurley*, 163 B.R. 286, 291 (Bankr. W.D. Tex. 1993) (citing *Grogan v. Garner,* 498 U.S. 279 (1991)). "If the evidence is such that a decision on point cannot be made one way or the other, the party with the burden of proof loses." *Id.* (citation omitted).

## C. Snap-shot Rule

In determining whether property is exempt, courts consider the law and facts as they existed on the date a debtor filed for bankruptcy. *White v. Stump*, 266 U.S. 310, 313 (1924). "Generally, in a chapter 7 bankruptcy case, the status of a debtor's exemption is not altered by a debtor's post-petition conduct.  *See Myers v. Matley*, 318 U.S. 622, 628 (1943) (citing *Stump*, 266 U.S. at 313) (stating that a "bankrupt's right to a homestead exemption becomes fixed at the date of the filing of the petition in bankruptcy and cannot thereafter be enlarged or altered by anything the bankrupt may do"); *see also Lowe v. DeBerry (In re DeBerry)*, 884 F.3d 526, 529, 530 (5th Cir. 2018) (concluding that a homestead owned on the date of bankruptcy filing, but sold post-petition, is

"subject to an unconditional exemption under Texas law" )

### D. Debtor's Homestead Exemption

#### 1. Debtor did not abandon 15 Esquire because as of the Petition Date, Debtor still resided at 15 Esquire.

#### a. Factual Findings

On November 12, 2007, Debtor and LeAnn purchased 15 Esquire in their individual capacities. Also on November 12, 2007, Debtor and LeAnn executed a deed of trust in favor of Compass Bank to secure a mortgage loan and promissory note in the principal amount of $2,171,085.00, the proceeds of which were utilized to purchase 15 Esquire (the "15 Esquire Mortgage"). In December 2017, 30 Post Shadow was purchased.

In November 2017, LeAnn submitted three different enrollment applications to Houston schools for the Cyrs' school-aged children. Around the same time, LeAnn also submitted enrollment applications to schools in San Antonio.  Debtor testified that enrollment applications were submitted for schools in both cities because a decision had not yet been made about temporarily moving his family, but not him, to Houston. As of the Petition Date, Debtor, LeAnn and their children lived at 15 Esquire and did so until at least April 20, 2018. Debtor has never moved out of 15 Esquire.

A real estate agent, Adam Rivera ("Rivera") created a brochure, Le Grande Maison Brochure, and an online tour of 15 Esquire and its adjoining property, 8 Villers St. Paul, San Antonio, Texas ("8 Villers").[5] Debtor and LeAnn testified that neither the brochure nor video were created in anticipation of the sale of the two properties. Debtor testified that the brochure and video were created so that Rivera could show the Cyrs an example of his work product in the event they

---

[5] Debtor does not claim 8 Villers as part of his homestead. 8 Villers was transferred to the BHT on or about October 5, 2012. The transfer of 8 Villers to the BHT is the subject of adversary proceeding 18-05227.

wanted to sell 15 Esquire at a later date. LeAnn testified that the purpose of the brochure and video was so that Rivera could use the products as part of his professional portfolio.

### b. Parties' Contentions

The Trustee and Key object to Debtor's claim of exemption to 15 Esquire as Debtor's homestead on the grounds that 15 Esquire was abandoned. The Cyrs argue that their continued overt use and occupancy of 15 Esquire on the Petition Date precludes a conclusion that 15 Esquire was abandoned. The Court concludes that, as of the Petition Date, Debtor did not abandon 15 Esquire.

### c. Legal Standard

"[H]omesteads are favorites of the law, [and] we must give a liberal construction to the constitutional and statutory provisions that protect homestead exemptions." ***Bradley v. Pac. Sw. Bank, FSB (In re Bradley)***, 960 F.2d 502, 507 (5th Cir. 1992) (citation omitted). "Indeed, we must uphold and enforce the Texas homestead laws even though in so doing we might unwittingly assist a dishonest debtor in wrongfully defeating his creditor." ***Id.*** (citation omitted). "It is well settled in Texas that an individual who seeks homestead protection has the initial burden to establish the homestead character of her property." ***Id.*** To satisfy this burden, "the claimant must have a possessory interest in the homestead he or she is claiming." ***In re Saldana***, 531 B.R. 141, 156 (Bankr. N.D. Tex. 2015) (citation omitted). Mere ownership or possessory interest, however, is not of itself sufficient to establish a homestead. ***Id.*** (citation omitted). "A claimant must show both (i) overt acts of homestead usage and (ii) the intention on [his] part . . . to claim the land as a homestead." ***Id.*** (alteration in original) (citation omitted). Once a claimant has established the homestead character of property, "[h]omestead rights may only be lost through death, abandonment, or alienation." ***Perry v. Dearing et al. (In re Perry)***, 345 F.3d 303, 310 (5th Cir. 2003).

"To abandon a homestead, the owner of the property must evince a 'present, definite[,] and permanent intent to cease use of the property for homestead purposes.'" *In re Bradley*, 960 F.2d at 508 n.11 (citing *West Tex. St. Bank v. Helms*, 326 S.W.2d 47, 49 (Tex. Civ. App.—Eastland 1959, no writ.)). Specifically, abandonment constitutes (1) cessation or discontinuance of use of the property as a homestead and (2) an intent to permanently abandon the homestead. *Montague v. Nat'l Loan Inv., L.P.*, 70 S.W.3d 242, 248 (Tex. App.—San Antonio 2001, no pet.). Stated differently, abandonment of a homestead requires proof of discontinued use and intent never to return. *Drake Interiors, Inc. v. Thomas*, 544 S.W.3d 449, 452 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Courts have held that abandonment of a residential homestead is best evidenced by the establishment of a new and permanent home has been acquired and occupied. *King Louie Mining, LLC v. Comu (In re Comu)*, 542 B.R. 371, 386, 386 n.82 (Bankr. N.D. Tex. 2015) (citing *Coury v. Prot*, 85 F.3d 244, 254 (5th Cir. 1996) ("By way of example, [establishment of a new and permanent home] could include the acquisition of another home, removal of the family from one dwelling to another, its occupancy and use as a homestead, and an absence of acts evidencing an intention to return to the former home." (citing *Kendall Builders, Inc. v. Chesson*, 149 S.W.3d 796, 809 (Tex.App.—Austin, 2004, pet. denied)). Moreover, where a homestead claimant is married, a homestead cannot be abandoned without the consent of the claimant's spouse. Tex. Prop. Code Ann. § 41.004 (West 2019).

Finally, under the snap-shot rule, the Petition Date is the operative date in determining whether a homestead is exempt, and a homestead owned on the date of bankruptcy filing is "subject to an unconditional exemption under Texas law." *In re DeBerry*, 884 F.3d at 529, 530. Therefore, post-petition conduct by the Cyrs is irrelevant for purposes of determining whether 15 Esquire was abandoned.

### d. Discussion

The Parties do not dispute that 15 Esquire was at one-point Debtor's homestead. Thus, the issue before the Court is whether Debtor abandoned 15 Esquire. As previously mentioned, Key and the Trustee have the burden of proving that Debtor and LeAnn discontinued the use of 15 Esquire and manifested an intent to permanently abandon 15 Esquire. Key directs the Court to evidence that Debtor manifested an intent to permanently abandon 15 Esquire,[6] but Key did not prove that as of the Petition Date, Debtor discontinued the use of 15 Esquire. To the contrary, the undisputed evidence is that on the Petition Date, Debtor and his family resided at 15 Esquire. Therefore, even if Debtor manifested an intent to permanently abandon 15 Esquire, such a showing alone is not sufficient for this Court to conclude that Debtor abandoned 15 Esquire.

Additionally, the purchase of 30 Post Shadow did not constitute abandonment of 15 Esquire. In December 2017, 30 Post Shadow was purchased. LeAnn and the Cyrs' children, however, did not move to 30 Post Shadow until April of 2018—approximately three months after the Petition Date. Therefore, abandonment of 15 Esquire cannot be evidenced by the purchase of 30 Post Shadow because as of the Petition Date, 30 Post Shadow had been purchased, but not occupied.

### 2. When Debtor transferred 15 Esquire to the Living Trust, 15 Esquire lost its exemption status.

### a. Factual Findings

On September 12, 2014, Debtor and LeAnn created the Living Trust which named Debtor and

---

[6] Key argues that Debtor's and LeAnn's intention to abandon 15 Esquire as their homestead is manifested by a series of overt acts by Debtor and LeAnn in connection with (1) the transition of SASpine operations to Houston; (2) the shopping for and ultimate purchase of 30 Post Shadow; (3) the preparation and posting on the Internet by Rivera of the online video of 15 Esquire and 8 Villers, which was approved by LeAnn coupled with the preparation and approval of the Le Grande Maison Brochure; and (4) the submission of applications for admissions to at least three Houston-area private schools for the Cyrs' children as well as the eventual enrollment and attendance of those children for the 2018–2019 school year.

LeAnn as Trustmakers,[7] trustees, and beneficiaries of the Living Trust. Also, on September 12, 2014, Debtor and LeAnn transferred 15 Esquire to the Living Trust by warranty deed. The Living Trust has no other assets other than 15 Esquire, no source of income, nor does it hold a bank account. Debtor resigned as trustee of the Living Trust effective January 1, 2018 thereby leaving LeAnn as the only remaining trustee for the Living Trust.[8]

Debtor and LeAnn in their individual capacities are solely liable for the monthly payments on the 15 Esquire Mortgage.[9] Up until 2014, LeAnn and Debtor were making the payments on the 15 Esquire Mortgage. Nonetheless, since on or about the time the Living Trust was created and 15 Esquire was transferred to the Living Trust, the BHT has been making the monthly payments on the 15 Esquire Mortgage.[10] The Living Trust does not charge the Cyrs for living in and using 15 Esquire, nor is there an agreement between the Cyrs and the Living Trust that requires the Cyrs to pay any expenses related to living at 15 Esquire. Additionally, there is no written agreement between the BHT and the Living Trust to pay the 15 Esquire Mortgage, and there is no agreement for any other person to pay the mortgage at 15 Esquire.

The Living Trust was created as part of the Cyrs' estate tax planning. As such, the Living Trust

---

[7] "Trustmaker" is a defined term in the Living Trust. Under the terms of the Living Trust, Debtor and LeAnn as Trustmakers are also settlors. (Exhibit 3, § 17.07(u)) ("Trustmaker has the same legal meaning as Grantor, Settlor, Trustor, or any other term referring to the maker of a trust").

[8] Debtor filed his voluntary petition for relief on January 20, 2018. Debtor is not sure why he resigned from the Living Trust nineteen days prior to the Petition Date. Debtor testified that the letter tendering his resignation as trustee to the Living Trust was given to him and he felt it was trustworthy, so he signed it. Debtor did not recall whether he resigned on the advice of counsel. Debtor testified that if someone hands him a form like the resignation letter to him and he trusts that person, he tends to sign it. Debtor testified that he was not aware of any effects his resignation as trustee to the Living Trust would have. Debtor testified that he believes his wife handed him the resignation letter to sign. LeAnn testified that she believes Debtor resigned as trustee on the advice of counsel.

[9] LeAnn and Debtor, in their individual capacities, are the borrowers under the 15 Esquire Mortgage. The Living Trust is not a borrower on that mortgage, nor is the Living Trust a guarantor.

[10] Debtor testified that if the BHT stopped paying the mortgage, he thinks there would be a default on the mortgage. Debtor also testified that if the BHT stopped paying the mortgage on 15 Esquire, he is not sure whether he and LeAnn would be able to make the monthly mortgage payment as LeAnn is "pretty resourceful." On cross-examination, Debtor testified that if for some reason the mortgage could not be paid, he would pay it by getting another job.

14

makes several references to the Internal Revenue Code and Treasury Regulations. The Living Trust makes no references to the Texas Property Code.

### b. Parties' Contentions

SNH argues that Debtor lost his homestead exemption under the Texas Property Code when the Cyrs transferred 15 Esquire to the Living Trust because the Living Trust does not constitute a "qualifying trust" under subsections 41.0021(a)(1) of the Texas Property Code (the "Qualifying Trust Provision"). Debtor contends that the Living Trust does satisfy the requirements under the Qualifying Trust Provision and therefore 15 Esquire remains exempt from the claims of creditors.

### c. Discussion

Prior to the enactment of the section 41.0021 of the Texas Property Code, an individual lost his or her homestead protection when a person transferred a homestead to a living trust by warranty deed because the transfer of the homestead constituted a transfer of legal title. Bill Analysis, Tex. H.B. 3767, 81st Leg., R.S. (2009). Section 41.0021 of the Texas Property Code was enacted to counter that result by allowing a trustee to transfer, by warranty deed, real property designated as a homestead into a "qualifying trust" without affecting the homestead designation of the property. *Id.* Specifically, section 42.001 of the Texas Property Code provides that "[p]roperty that a settlor or beneficiary occupies and uses in a manner described by this subchapter and in which the settlor or beneficiary owns a beneficial interest through a *qualifying trust* is considered the homestead of the settlor or beneficiary under Section 50, Article XVI, Texas Constitution, and Section 41.001." Tex. Prop. Code § 41.0021(b) (emphasis added). A "qualifying trust"

means an express trust:

(1)     in which the instrument or court order creating the trust provides that a settlor or beneficiary of the trust has the right to:

(A) revoke the trust without the consent of another

15

person [the "Revocation Provision"];

(B) exercise an inter vivos general power of appointment over the property that qualifies for the homestead exemption[the "Power of Appointment Provision"]; or

(C) use and occupy the residential property as the settlor's or beneficiary's principal residence at no cost to the settlor or beneficiary, other than payment of taxes and other costs and expenses specified in the instrument or court order:

  (i) for the life of the settlor or beneficiary;

  (ii) for the shorter of the life of the settlor or beneficiary or a term of years specified in the instrument or court order; or

  (iii) until the date the trust is revoked or terminated by an instrument or court order recorded in the real property records of the county in which the property is located and that describes the property with sufficient certainty to identify the property [the "No Cost Provision"]; and

(2)     the trustee of which acquires the property in an instrument of title or under a court order that:

(A) describes the property with sufficient certainty to identify the property and the interest acquired; and

(B) is recorded in the real property records of the county in which the property is located.

*Id.* at 41.0021(a). Therefore, when a homestead is transferred to a living trust, that homestead does not lose its exempt status and remains protected from the claims of creditors if the homestead is transferred to a qualifying trust. As Debtor and LeAnn point out, the Qualifying Trust Provision is written in the disjunctive; therefore, only one of the three requirements identified in the Qualifying Trust Provision must be satisfied for the Living Trust to constitute a "qualifying trust" under the Texas Property Code.

i.  **The Cyrs do not have the right to revoke the Living Trust without the consent of another person because the Living Trust authorizes the Cyrs to revoke the Living Trust only when the Cyrs act jointly.**

SNH first contends that the Living Trust is not a qualifying trust because the Living Trust does not allow either LeAnn or Debtor the right to revoke the Living Trust without the consent of the other. Stated differently, SNH contends that the Revocation requires that a settlor or beneficiary of the trust be able to revoke the trust without the consent of any other person, including the consent of a co-settlor or co-beneficiary. Conversely, Debtor argues that the Living Trust satisfies the Revocation Provision because as settlors of the Living Trust, LeAnn and Debtor have the ability to revoke the Living Trust without any other person's consent. The Court concludes that the Living Trust does not allow either Debtor or LeAnn to revoke the Living Trust without the consent of another person.

When construing Texas statutes, courts must "ascertain and give effect to the [Texas] Legislature's intent as expressed by the statute's language." *Presido Indep. Sch. Dist. v. Scott*, 309 S.W.3d 927, 930 (Tex. 2008). "Where the text is clear, it is determinative of that intent, and we give meaning to the language consistent with other provisions in the statute[.]" *Id.* (citation omitted). The Texas Supreme Court's practice "when construing a statute is to recognize that 'the words [the Legislature] chooses should be the surest guide to legislative intent." *Id.* (alteration in original) (citation omitted). Therefore, this Court must "construe the text according to its plain and common meaning unless a contrary intention is apparent from the context or unless such a construction leads to absurd results." *Id.* (citation omitted). This Court "also presume[s] that the Legislature intended a just and reasonable result by enacting the statute." *Id.*; *see also* Tex. Gov't Code Ann. § 311.021(3).

Section 41 of the Texas Property Code does not define "person." Chapter 311 of the Government Code (the "Code Construction Act"), however, broadly defines "person" to include

"corporation[s], organization[s], government[s] or governmental subdivision[s] or [agencies], business trust[s], estate[s], trust, partnership[s], association[s], and any other legal [entities]." Tex. Gov't Code § 311.005(2).[11] This definition does not concretely define "person" but rather provides examples of what constitutes a "person." *Id.* at § 311.005(13) (instructing that the use of the term "including" is a term of "enlargement and not of limitation or exclusive enumeration, and the use of the term[] does not create a presumption that components not expressed are excluded"). Because the Court has no other statutory definition of "person" to apply, the Court must construe the term according to its plain and common meaning. "Person" is defined as "a human being" and is also termed "natural person." *Person,* BLACK'S LAW DICTIONARY (11th ed. 2019). "So far as legal theory is concerned, a person is any being whom the law regards as capable of rights or duties." *Id.* (citing JOHN SALMOND, JURISPRUDENCE 318 (Glanville L. Williams ed., 10th ed. 1947)). As such, the term "person" is broad, and encompasses all the entities identified in the Code Construction Act as well as beings with rights and duties.

The Revocation Provision begins by identifying which persons the trust instrument must expressly provide rights to—the settlor or beneficiary—and then states that the trust instrument must provide that a settlor or beneficiary of the trust instrument has the right to revoke the trust instrument without the consent of another person. Unless otherwise indicated, general words, such as the term "person," should be afforded their "full and fair scope[,] . . . . and should not be arbitrarily limited." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXAS 101 (2012). "[T]he presumed point of using general words is to produce general coverage—not to leave room for courts to recognize ad hoc exceptions." *Id.* "It is true that a literal

---

[11] The Texas Property Code adopts the conventions of statutory construction provided in the Code Construction Act unless the Texas Property Code expressly provides otherwise. Tex. Prop. Code § 1.002.

meaning is more readily discernable when the provisions are concrete and specific than when they are abstract and general, and one is right to hesitate and ponder before deciding that a specific factual situation falls within the coverage of a general provision." *Id.* "But in the end, general words are general words and they must be given general effect." *Id.*

"Person" is a general term, and according to its applicable statutory definition and plain and common meaning, the term is broad. There are no circumstances or conditions indicating that the Court should not afford the term its full and fair scope. Moreover, the specific use of the terms "settlor" and "beneficiary" immediately before the use of the term "person" further suggests to the Court that the term "person" should be treated generally and not arbitrarily limited to all other persons except for co-settlors and co-beneficiaries. *See id.* at 170 ("[W]here a document has used one term in one place and a materially different term in another, the presumption is that the different term denotes a different idea. If it says *land* in one place and *real estate* later, the second provision presumably includes improvements as well as raw land." (emphasis in original)). Logically, it follows that for purposes of the Revocation Provision, "person" includes all human beings with rights and duties, including other settlors or beneficiaries of the same trust instrument.

Here, §1.04(b) of the Living Trust provides in relevant part:

> As *Trustmakers*,[ 12] we retain the powers set forth in this Section in addition to any powers that we reserve in other provisions of this instrument.
> . . .
>   (b) Amendment, Restatement, or Revocation
>
>   *Acting jointly,* we may amend, restate, or *revoke this instrument, in whole or in part, for any purpose.* Acting jointly, we retain the absolute right to amend, restate, or revoke any term or provision of this trust in whole or in

---

[12] Under the terms of the Living Trust, Debtor and LeAnn as Trustmakers are also settlors. (Exhibit 3, § 17.07(u)) ("Trustmaker has the same legal meaning as Grantor, Settlor, Trustor, or any other term referring to the maker of a trust").

part. Each of us individually retains the right to revoke
any term or provision of this trust in whole or in part as
to each of our separate property.

(Joint Exhibit 3, § 1.04(b)). The Living Trust authorizes Debtor and LeAnn to revoke the Living

Trust, but only when acting jointly. In other words, neither Debtor nor LeAnn are authorized

revoke the Living Trust individually and can only do so with each other's consent. Because the

Revocation Provision requires that the Living Trust expressly provide either Debtor or LeAnn with

the right to revoke the Living trust without the consent of any other person, including each other

as co-settlors and co-beneficiaries, and the Living Trust only permits Debtor and LeAnn to revoke

the trust when acting jointly, the Living Trust does not satisfy the Revocation Provision.

The Texas Trust Code (the "Trust Code") is a title under the Property Code and serves as

the governing authority for the Living Trust; therefore, the Court must consider the Revocation

Provision in relation to the Trust Code. *See **TGS–NOPEC Geophysical Co. v. Combs***, 340 S.W.

3d 432, 439 (Tex. 2011) (directing courts to consider specific statutory language while looking to

the statute as a whole, rather than as isolated provisions).  The Trust Code defines "person" to

mean a number of subjects, including "an individual" and "two or more persons having a joint or

common interest[.]" Prop. Code § 111.004(1)(A) and (J). Were the Court to substitute the term

"person" under the Revocation Provision with the definition of "person" under the Trust Code, the

result would does not change. Neither LeAnn nor Debtor have the right revoke the Living Trust

without the consent of another individual because the Living Trust requires joint consent between

Debtor and LeAnn to revoke the Living Trust. Likewise, the Cyrs do not have the right to revoke

the Living Trust without the consent of "persons having a joint or common interest." As co-settlors

and co-beneficiaries, Debtor and LeAnn have a common interest in the Living Trust. To satisfy

the Revocation Provision using this language, the Living Trust would have to state that either

Debtor and LeAnn have the right to revoke the trust without the consent of each other. The Living

20

Trust states the exact opposite requiring joint consent to revoke the Living Trust. Therefore, even construing the Revocation Provision in light of the Trust Code, the Living Trust does not grant either Debtor or LeAnn the right to revoke the Living Trust without the consent of another person.

The Cyrs argue that the Texas Property Code does not require that there be only one settlor that has the right to revoke the trust without the consent of another person nor does it provide that a trust may have only one settlor. The Cyrs are effectively advocating that an exception should be made to the Revocation Provision for trusts containing multiple settlors. The Court cannot ignore the plain language of the statute and it is not this Court's function or within this Court's power to improve or change the law. SCALIA & GARNER, *supra* at 93. Nor should this Court add "unprovided-for exceptions to a text." *Id.* "[I]f the Congress [had] intended to provide additional exceptions, it would have done so in clear language. *Id.* (citing ***Petteys v. Butler***, 367 F.2d 528, 538 (8th Cir. 1966) (Blackmun, J. dissenting)).

Debtor submits that he executed a durable, general, power of attorney in favor of LeAnn to allow her to act for him, as his representative, and therefore LeAnn individually can revoke the Living Trust. This evidence, however, is irrelevant to the Court's analysis as the Qualifying Trust Provision only contemplates what the trust instrument states. Prop. Code § 42.001(b) (defining "qualifying trust" according to what the trust instrument provides). Here, the Living Trust expressly requires that the Cyrs have the right to revoke the Living Trust only when acting jointly. Moreover, the Debtor does not direct the Court to any provision in the Living Trust, and the Court cannot locate such a provision, which incorporates or references the durable, general power of attorney referenced by Debtor.

Finally, Debtor contends that if the Court adopts SNH's position, the Court's holding would effectively mean that if there are multiple settlors of a revocable trust, then such a trust

cannot be a "qualifying trust" under the Qualifying Trust Provision and that such a theory does not provide the proper liberal construction required for Texas homestead laws. The Court disagrees. As Debtor points out, the Qualifying Trust Provision is written in the disjunctive; therefore, a trust instrument need only satisfy one of three requirements to constitute a qualifying trust. Therefore, a trust can be irrevocable and still constitute a qualifying trust if either the other two requirements are satisfied.

The Court is aware that "[b]ecause homesteads are favorites of [Texas] law, we must give a liberal construction to the constitutional and statutory provisions that protect homestead exemptions." *In re Bradley*, 960 F.2d 502, 507 (5th Cir. 1992). While Texas homestead protections are to be liberally construed, Texas homestead protections are not limitless—as evidenced by the Qualifying Trust Provision. Moreover, a liberal statutory construction does not mandate that this Court render an interpretation that is inconsistent with the language of the statute.

ii. **The Living Trust does not provide that Debtor or LeAnn, as settlors or beneficiaries of the Living Trust, have the right to the right to exercise an inter vivos general power of appointment over 15 Esquire.**

SNH submits that no provision in the the Living Trust grants either Debtor or LeAnn the right to exercise an inter vivos general power of appointment over 15 Esquire. The Cyrs contend that LeAnn has the power of appointment over 15 Esquire under § 1.04(c) of the Living Trust. The Court concludes § 1.04(c) of the Living Trust does not grant such general power of appointment.

Section 1.04(c) provides:

> As Trustmakers, we retain the powers set forth in this Section in addition to any powers that we reserve in other provisions of this instrument.
> . . .
> > (c) Addition or Removal of Trust Property
>
> > Either of us may add property to our trust. Both of us, acting jointly may remove property from our trust. Each of us, acting alone, may remove our own separate

> property from our trust. Community property removed
> from our trust will retain its character as community
> property.

(Exhibit 3, § 1.04(c)). Section 1.04(c) of the Living Trust addresses addition and removal of trust property, allowing Debtor and LeAnn to act individually with regards to the addition of property and jointly with regards to the removal of community property. Section 1.04(c) also allows Debtor and LeAnn to act individually with respect to separate property. The Parties do not dispute that 15 Esquire is community property.

A power of appointment is "the authority to appoint or designate the recipient of property, to invade or consume property, to alter, amend, or revoke an instrument under which an estate or trust is created or held, and to terminate a right or interest under an estate or trust, and any authority remaining after a partial release of a power." Tex. Prop. Code § 181.001(2); In other words, "[a] power of appointment is a power of disposition given to a person over property not his own, by someone who directs the mode in which that power shall be exercised by a particular instrument." *Bank of Dallas v. Fredericks*, 283 S.W.2d 39, 47 (Tex. 1955) (citation omitted). "It is an authority to do an act which the owner granting the power might himself lawfully perform." *Id.* "This power enables the donee to designate, within such limits as the donor may prescribe, the transferees of the property." *Id.* "If the donor of the power of appointment, the person who creates it, restricts the persons to whom an appointment can be made, and the group of permissible appointees does not include the person who is to exercise the power, the donee, the power is commonly designated 'special.'" *G.A.C. Halff Found. v. Calvert*, 287 S.W.2d 178, 182 n.2 (Tex. Civ. App.—San Antonio 1955, writ. ref'd n.r.e.) (citation omitted). Conversely, if "the donor has so drawn the power that the donee can appoint to himself or to his estate, the power is 'general.'" *Id.* (citation omitted). The Restatement First illustrates an example of a general power of appointment:

> A, owner of Blackacre in fee simple absolute, by will transfers Blackacre to B for life, remainder to such person or persons as B shall appoint, and in default of appointment to C. B has a power of appointment.

RESTATEMENT (FIRST) OF PROPERTY § 318 illus. 1 (AM. LAW INST. 1940).

The Cyrs contend that § 1.04(c) constitutes a general power of appointment because it grants the Cyrs the right to remove 15 Esquire from the Living Trust thereby giving them unrestricted authority over what happens to 15 Esquire. A power of appointment dictates the disposition of certain property and creates interests in appointees. *Moore v. Wardlaw*, 522 S.W.2d 552, 558 (Tex. Civ. App.—Austin 1975 writ. ref'd n.r.e.) ((distinguishing between a power of appointment and a power of sale and concluding that a power of sale does not constitute a power of appointment (citing RESTATEMENT (FIRST) OF PROPERTY § 318 cmt. 2.); *see also* RESTATEMENT (FIRST) OF PROPERTY §§ 318(1), 319 cmt. f)). Section 1.04(c) merely allows the Cyrs to remove 15 Esquire from the Living Trust. It does not give the Cyrs, as donees, the right alter the disposition of 15 Esquire, nor does it create interests in 15 Esquire to any appointees. Moreover, unlike other powers of appointment contained in the Living Trust, [13] § 1.04(c) contains no express reference to a power of appointment nor does it use other terms sufficient to infer the creation of a power of appointment. RESTATEMENT (FIRST) OF PROPERTY § 323 cmt. a ("In the great majority of cases powers are created by the use of the word "appoint." But other words, such as 'dispose' or 'devise,' are sufficient to create a power of appointment when, in their context, they indicate that the transferor so intended."). Finally, the Power of Appointment Provision requires that the Living

---

[13] SNH correctly points out that the Living Trust contains other express powers of appointment. (Joint Exhibit 3, § 8.07 (General Power of Appointment regarding the Survivor's Trust); § 9.04 (General Power of Appointment over Stub Income); § 9.05 (Testamentary Limited Power of Appointment regarding the Marital Trust); § 10.05 (Testamentary Limited Power of Appointment regarding the Family Trust); § 11.04 (General Power of Appointment over Property Subject to Taxable Generation-Skipping Transfers); § 15.09 (Exercise of Testamentary Power of Appointment); and § 15.22 (Independent Trustee May Confer Testamentary Power of Appointment).

Trust grant a settlor or beneficiary the right to exercise an *inter vivos* general power of appointment. Section 1.04(c) contains no reference to whether the Cyrs' rights are exercisable during their lifetime. Based on the foregoing, the Court concludes that § 1.04(c) does not satisfy the Power of Appointment Provision.

### iii.    The Living Trust does not provide that Debtor and LeAnn can live at 15 Esquire *at no cost* and therefore, does not constitute a qualifying trust on that basis.

SNH argues that the Living Trust does not satisfy the No-Cost Provision because the language contained in the Living Trust grants LeAnn and Debtor the right to occupy 15 Esquire "rent free and without charge" as required by the Texas Tax Code (the "Tax Code") rather than "at no cost" as required by the No-Cost Provision. Debtor and LeAnn argue that the difference in terminology is a distinction without a difference and therefore the Living Trust satisfies the No-Cost Provision. The Court concludes that § 1.06 of the Living Trust does not satisfy the requirements of the No-Cost Provision.

The Tax Code exempts from taxation a residence homestead that an owner uses as his home, even where the home is "owned by one or more individuals, either directly or through a beneficial interest in a qualifying trust." Tex. Tax. Code Ann. § 11.13(a) and (j). For purposes of the Tax Code, a

> "qualifying trust" means a trust: in which the agreement, will, or court order creating the trust, an instrument transferring property to the trust, or any other agreement that is binding on the trustee provides that the trustor of the trust or a beneficiary of the trust has the right to use and occupy the trustor's or beneficiary's principal residence residential property *rent free and without charge* except for taxes and other costs and expenses specified in the instrument or court order . . . .

*Id.* at 11.13(j) (emphasis added). The Qualifying Trust Provision, however, exempts a homestead from being subject to the claims of creditors where the homestead is transferred to a "qualifying trust." Prop. Code § 41.0021(b). For purposes of the Property Code, a trust can qualify as a

25

qualifying trust in one of three ways, including when the trust instrument provides that a settlor or beneficiary of the trust has the right to "use and occupy the residential property as the settlor's or beneficiary's principal residence at *no cost* to the settlor or beneficiary, other than payment of taxes and other costs and expenses specified in the instrument or court order . . . ." *Id.* at 41.0021(a)(1)(C) (emphasis added). The Tax Code and the No-Cost Provision differ in that the Tax Code requires that the trust document allow a trustor or beneficiary to use and occupy the residence *rent free and without charge*, while the No-Cost Provision requires that the trust instrument allow a settlor or beneficiary use and occupy the residence at *no cost*.[14]

At issue is whether the language in the Living Trust, which allows the Cyrs to use and occupy 15 Esquire "rent free and without charge," satisfies the No-Cost Provision of the Qualifying Trust Provision. The term "qualifying trust" in both the Tax Code and Property Code are statutorily defined terms and whether or not a particular trust instrument satisfies each statutory definition depends on the terms of the trust instrument. Tax Code § 11.13(j) (defining "qualifying

---

[14] Also notable is that the protections given to homesteads under the Property Code and those protections given to homesteads under the Tax Code originate from different constitutional provisions. The homestead protections afforded by the Qualifying Trust Provision are provided by Article XVI, § 50(a) of the Texas Constitution which, with some exceptions, that prevents the forced sale of a homestead for the payment of general debts. On the other hand, the tax exemptions afforded to residence homesteads are a product of Article VIII, § 1-b of the Texas Constitution which permits in some instances, and requires in others, taxing units to grant residence-homestead exemptions from ad valorem property taxes." Tex. Att'y Gen. Op. No. JC-0415 (2001) (citing Tex. Const. art. VIII, § 1-b). Additionally, Article XVI, § 50(a) does not protect a homestead from forced sale for payment of property taxes that may be due on the homestead, and likewise, Article VIII, § 1-b does not protect a homestead from forced sale for payment of general debts. *Id.*; *see also* **Hutson v. Tri-County Props., LLC**, 240 S.W.3d 484, 488–89 (Tex. 2007) (distinguishing between the different constitutional protections afforded to residence homesteads under the Tax Code and homesteads under the Property Code.).

As previously recognized, "homesteads are favorites of Texas law requiring courts to liberally construe the constitutional and statutory provisions that protect homestead exemptions from seizure for general debts." ***In re Bradley***, 960 F.2d at 507. Exemptions from taxation, however, are not favored by the law, and statutory exemptions from taxation are subject to strict construction because the exemptions undermine equality and uniformity by placing a greater burden on some taxpayers rather than all. ***N. Alamo Water Supply Corp. v. Willacy Cty. Appraisal Dist.***, 804 S.W.2d 894, 899 (Tex. 1991). Therefore, an exemption [under the Tax Code] cannot be raised by implication, but must be affirmatively shown, resolving all doubts in favor of the taxing authority and against the claimant. ***Bullock v. Nat'l Banchsares Corp***., 584 S.W.2d 286, 272 (Tex. 1979).

trust" according to what the "agreement, will, or court order creating the trust, an instrument transferring property to the trust, or any other agreement that is binding on the trustee provides"); Prop. Code § 41.0021(a)(1) (defining "qualifying trust" according to the rights provided in "the instrument or court order creating the express trust"). Section 1.06 of the Living Trust provides in relevant part:

> The Trustmakers reserves the right to use or occupy the Trustmakers' principal residence *rent-free and without charge* after the property is placed in this trust.

(Joint Exhibit 3, § 1.06).

The phrases "rent-free and without charge" and "at no cost," are not statutorily defined, and indeed, should be construed according to the rules of grammar and common usage "unless a contrary intention is apparent from the context or unless such a construction leads to absurd results." *Scott*, 309 S.W.3d at 930. "Rent" is defined as "a usually fixed periodical return made by a tenant or occupant of property to the owner for the possession and use thereof[,] especially : an agreed sum paid at fixed intervals by a tenant to the landlord. *Rent*, MERRIAM-WEBSTER DICTIONARY (11th ed. 2003). "Charge" is defined as "expense, cost[,]" "the price demanded for something[,] and "a debit to an account." *Charge, Id.*

> The doctrine of construction—*noscitur a sociis*—teaches that "the meaning of particular terms in a statute may be ascertained by reference to words associated with them in the statute; and that where two or more words of analogous meaning are employed together in a statute, they are understood to be used in their cognate sense, to express the same relations and give color and expression to each other."

*City of Fort Worth v. Cornyn*, 86 S.W.3d 320, 326 (Tex. App.—Austin 2002, no pet.). In the Tax Code's definition of qualifying trust, the phrase "without charge" immediately proceeds the phrase "rent free" and the two phrases are linked by an "and" indicating that the definition of "charge" is related to the term "rent." Under *noscitur a sociis*, the term "charge" should be construed as

expenses and costs relating to the payment of rent. Consequently, the phrase "rent-free and without charge" encompasses only rent and expenses and costs related to the payment of rent. Conversely, "cost" is defined as "the amount or equivalent paid or charged for something" and "the outlay or expenditure (as of effort or sacrifice) made to achieve an object." *Cost*, *Id.* The term "cost" under the No Cost Provision is not limited by any accompanying terms or phrases and should be construed according to its full and fair scope—an amount or equivalent paid or charged for something, regardless of the object being paid for. As such, the phrase "rent free and without charge" under the Tax Code carries a different meaning than the phrase "at no cost" under the Property Code.

Here, § 1.06 of the Living Trust permits Debtor and LeAnn the right to live at 15 Esquire "rent free and without charge." For a trust instrument to satisfy the No Cost Provision, the trust instrument must state that Debtor and LeAnn have the right to live at 15 Esquire "at no cost." As previously explained "at no cost" is broader than "rent free and without charge" and conceivably includes costs and expenses other than those related to rent. Therefore, while § 1.06 of the Living Trust may be sufficient to satisfy the requirements of a qualifying trust under the Tax Code, this language does not satisfy the No Cost Provision of the Property Code.

This holding also comports with the presumption that "[a]ll statutes are presumed to be enacted by the legislature with full knowledge of the existing condition of the law and with reference to it." *McBride v. Clayton*, 166 S.W.2d 125, 128 (Tex. 1942) "[Statutes] are therefore to be construed in connection and in harmony with the existing law, and as a part of a general and uniform system of jurisprudence, and their meaning and effect is to be determined in connection, not only with the common law and the constitution, but also with reference to other statutes and the decisions of the courts." *Id.* The Tax Code's definition of "qualifying trust" and its "rent free

and without charge" language was added to the homestead provisions of the Tax Code in 1993. Act of May 31, 1993 73d Leg. R.S. Ch. 854, H.B. 2813. The homestead protections afforded to individuals who transferred their homesteads to "qualifying trusts" under the Property Code and the accompanying definition of "qualifying trust" were added to the Texas Property Code in 2009. Act of June 19, 2009 81st Leg. R.S. Ch. 984, H.B. 3767. The definition of "qualifying trust" under the Tax Code had been in place for over fifteen years when the Texas Legislature enacted the Qualifying Trust Provision. The Texas Legislature, presumed to be armed with knowledge of the entire body of law, chose to define "qualifying trust" under the Property Code differently than it defined "qualifying trust" under the Tax Code. In fact, the Texas Legislature chose to materially vary the definition of "qualifying trust" in the Qualifying Trust Provision from that in the Tax Code by providing for additional means by which a trust could be deemed a qualifying trust. *See* Prop Code § 42.0021(b)(1)(A) and (B).

The plain language of the competing provisions is clear, and the Court has employed well-settled doctrines of statutory construction to interpret the provisions. While the Court's holding may not be ideal to the Cyrs' present circumstances, it is certainly not absurd. Both definitions of "qualifying trust" were in effect in 2014 when the Cyrs created the Living Trust and transferred 15 Esquire to the Living Trust. This is not a situation where the Tax Code was in effect, but the Qualifying Trust Provision was not in effect at the time the Living Trust was created. Moreover, the evidence is clear that the Living Trust was created as part of the Cyrs' estate tax planning. These intentions are clearly manifested not only by LeAnn's testimony, but by the multiple references to the Internal Revenue Code and the Treasury Regulations in the Living Trust.

Based on the foregoing analysis, the Court concludes that the Living Trust does not satisfy any of the three requirements under the Qualifying Trust Provision. As such, SNH's Objection on this

29

basis is sustained.

**E. Debtor's interest in the OSI 401(k) is exempt because on the Petition Date, Debtor had a right to assets held in or a right to receive payments from the OSI 401(k).**

   **1. Factual Findings**

OSI was the former entity that Debtor practiced under from 2005 through late 2017. OSI offered a 401(k) plan to its employees. Debtor claimed an exemption as to his 401(k) account with OSI (the "OSI 401(k)") in the amount of $216,170.82.

On November 29, 2017, Debtor sent a letter to Retirement Plan Consultants requesting a "complete termination of [OSI's] 401(k) plan currently held with Retirement Plan Consultants and the Plan Custodian TD Ameritrade Trust Company." (Joint Exhibit 8). The letter also stated "[t]he effective date of the plan termination and no further contributions will be made to the 401(k) plan effective December 31, 2017[sic?]." On December 27, 2017, Elizabeth Knight, OSI's Practice Administrator, signed and returned a Plan Termination Authorization Form terminating the service agreements between OSI's 401(k) Plan and Retirement Plan Consultants (the "Termination Request"). On January 17, 2018, LeAnn submitted, with Debtor's authorization, a Distribution Request Form (1) requesting a 100% withdrawal from Debtor's interest in the OSI 401(k), (2) waiving the 30-day waiting period permitted to consider the election of his withdrawal, and (3) directing that income tax be withheld from his distribution (the "Withdrawal Request"). Debtor also testified he did not have an intent to invest the OSI 401(k) proceeds into another 401(k), IRA, or other tax-exempt retirement plan.

TD Ameritrade issued Debtor a check dated February 21, 2018 in the amount of $162,642.97 (Joint Exhibit 12) (the "First Check"). The First Check expired on its own terms, and subsequently, TD Ameritrade issued Debtor a second check dated May 22, 2018 (the "Second Check"). LeAnn received both the First Check and the Second Check, however, neither Debtor nor LeAnn cashed,

deposited, or reinvested either check.

## 2. Parties' Contentions

The Objectors argue that Debtor's claimed exemption in the OSI 401(k) is not exempt because Debtor took all necessary steps to obtain a distribution from the OSI 401(k), including terminating the OSI 401(k) and requesting a withdrawal, prior to the Petition Date and did not subsequently reinvest the distribution in a qualifying retirement account. The Objectors also argue that the fact Debtor did not receive the First Check until after the Petition Date and that Debtor failed to cash or deposit either the First Check or Second Check has no bearing on the exemption analysis because as of the Petition Date, Debtor was owed and entitled to the OSI 401(k) proceeds.

Debtor argues that the Objectors do not meet their burden to show that the OSI 401(k) is not a properly claimed exemption because under application of the snap-shot rule, there is no evidence that as of the Petition Date, Debtor did anything other than request the termination of his 401(k) plan. As a result, because the OSI 401(k) funds were undistributed on the Petition Date, Debtor was not required to reinvest the 401(k) Proceeds within the sixty-days required under the Texas Property Code for the exemption to remain available.

## 3. Discussion

The issue before the Court is whether a debtor who requests a withdrawal of funds from a retirement account prior to filing bankruptcy, receives the funds post-petition, and neither intends to reinvest nor actually reinvests those funds into another retirement account within sixty days loses the exemption under Texas law. For the reasons stated below, the Court concludes that Debtor did not lose his claimed exemption in the OSI 401(k) under Texas law and as such, the Objectors' Objection is overruled as to the OSI 401(k).

In Texas, "a person's right to the assets held in or to receive payments [under a 401(k)] is

exempt from attachment, execution and seizure for the satisfaction of debts . . . ." Tex. Prop. Code § 42.0021(a). "Amounts distributed from a [401(k)] . . . entitled to an exemption . . . are not subject to seizure for a creditor's claim for 60 days after the date of distribution . . . ." *Id.* at .0021(c). "[T]he essential element of an exemption must continue in effect even during the pendency of a bankruptcy case." *In re Zibman*, 268 F.3d 298, 301 (5th Cir. 2001). Accordingly, "a change in the character of the property that eliminates an element required for the exemption voids the exemption, even if the bankruptcy proceedings have already begun." *In re Frost*, 744 F.3d 384, 388 (5th Cir. 2014). *Cf. In re Zibman*, 268 F.3d at 301 n.8 (concluding that "barring tolling, [where a homestead is sold pre-petition,] the exemption for the proceeds expires after six months, regardless of the intervening petition filing").

Here, LeAnn, on Debtor's behalf, exercised Debtor's right to the assets held in or to receive payments under the OSI 401(k) account by submitting the Withdrawal Request on January 17, 2018—three days before the Petition Date. The Withdrawal Request, however, did not eliminate Debtor's right to assets held in or to receive payments in Debtor's interest in the OSI 401(k) and therefore, Debtor's claimed exemption in the OSI 401(k) plan was unconditionally exempt on the Petition Date and not subject to the sixty-day reinvestment requirement. In other words, even though Debtor terminated the OSI 401(k) plan and submitted the Withdrawal Request pre-petition, on the Petition Date, Debtor's claimed exemption in the OSI 401(k) plan was unconditionally exempt because Debtor still maintained a right to assets held in or to receive payments from his 401(k).

The Objectors argue that because Debtor took all necessary steps to obtain a distribution from the OSI 401(k) prior to the Petition Date and did not subsequently reinvest the distribution in a qualifying retirement account within the 60-day statutory period, Debtor's claimed exemption in

the OSI 401(k) is not valid. Stated differently, but for the delay of the party distributing the First Check, Debtor would have been in possession of and entitled to the First Check prior to the Petition Date, and therefore, Debtor's interest in the claimed exemption would be conditionally exempt.

Whether Debtor took all necessary steps to obtain a distribution cannot be determined prospectively. In other words, whether Debtor took all necessary steps to receive the First Check was unknown on the Petition Date and could not be definitively determined until Debtor received the First Check or upon notice from TD Ameritrade of any deficiencies in the Withdrawal Request. This underscores the logic (whether intended or not) on conditioning the sixty-day reinvestment period on the date of distribution as opposed to the date of withdrawal because if the requested withdrawal was deficient, or additional steps had to be taken for a claimant to receive the actual distribution, a claimant would not otherwise get the benefit of the full sixty-day reinvestment period. Moreover, even given a satisfactory withdrawal request, the amount of time it takes to process a requested withdrawal and issue a distribution from a 401(k) account is not necessarily in the control of the claimant.

More importantly, the plain language of subsection 42.0021(a) of the Property Code exempts Debtor's right to assets held in or right to receive payments under the OSI 401(k). At the time LeAnn submitted the Withdrawal Request, Debtor still maintained these rights. If these rights had been eliminated at the time LeAnn requested the withdrawal, Debtor would not have been entitled to receive the First Check or, subsequently, the Second Check. Indeed, the distribution of the First Check triggered the sixty-day required reinvestment period and altered Debtor's interest in the OSI 401(k) from an unconditionally-exempt interest in the right to assets held or right to receive payment under the OSI 401(k) to a conditionally exempt interest in the distributions from the OSI 401(k). The First Check, however, was received post-petition and therefore, not included in the

petition-date snapshot.

As the Parties are aware, the Fifth Circuit recently held that "funds withdrawn from an exempted retirement account *after* the filing of a Chapter 7 bankruptcy do not lose their exempt status even if the money is not redeposited in a similar account within 60 days pursuant to Texas's proceeds rule." *In re DeBerry*, 884 F.3d 526, 528 (5th Cir. 2018) (emphasis added) (citing *In re Hawk*, 871 F.3d at 296)). *In re Hawk* involves debtors who filed a chapter 7 voluntary bankruptcy petition on December 15, 2013. Between December 11, 2013 and July 14, 2014, a time period which straddled the Hawk's bankruptcy petition date, the Hawks withdrew all of the funds from their IRA and used most of the funds to pay for living and other expenses. *Id.* In their schedule of assets, the Hawks claimed exempt IRA funds, and no party in interest objected to the IRA exemption. *Id.* None of the withdrawn funds were deposited into another retirement account. *Id.* Subsequent to learning about the liquidated retirement funds, the chapter 7 trustee sought an order compelling the Hawks to turnover the funds. *Id.* The bankruptcy court concluded that the funds "lost their exempt status" under Texas law because the Hawks did not roll the funds over to another IRA within 60 days. *Id.* The debtors appealed, and the district court affirmed the bankruptcy court's decision. On appeal, the issue before the Fifth Circuit was whether a debtor who *withdraws* funds from a retirement account and does not deposit the funds into another retirement account within 60 days loses the exemption under Texas law. *Id.* at 291 (emphasis added).

At first blush, this Court's holding appears to conflict with *In re Hawk*. *In re Hawk*, however, is distinguishable. The petition-date snap shot in *In re Hawk* appears to include pre-petition IRA withdrawals, but it is not clear what constituted a "withdrawal" for purposes of the Fifth Circuit's decision. Nonetheless, whether or not the pre-petition withdrawals were properly exempt, regardless of how "withdrawal" is defined, was not before the court in *Hawk*; rather, before the

court was a motion to turnover withdrawn IRA proceeds. When the motion to turnover was filed, the IRA proceeds had already been deemed exempt and not property of the estate because, as the Objectors point out, the chapter 7 trustee in *Hawk* failed to timely object to the Hawks' claimed exemptions. Furthermore, the Fifth Circuit stated that the pre-petition withdrawals were potentially subject to the sixty-day reinvestment requirement if the funds were *held* by the Hawks on the petition-date snapshot:

> [I]f the Hawks *held* amounts recently distributed from their retirement account when they filed for bankruptcy, those funds would be subject to the applicable sixty-day limitation on the exemption. The Trustee could have objected to the exemption if the liquidated funds were not rolled over into another retirement account within sixty days.[15] But the Trustee did not timely object to the claimed exemption, and under *Taylor*, the Trustee could not contest the exemption's validity after the time for objecting passed. The property interest was "withdrawn from the estate" when the exemptions were allowed, and there was no provision under which the Hawks subsequently acquired interests in amounts distributed from the IRA could become part of the estate. Accordingly, we hold that the bankruptcy court erred in ordering the Hawks to turn over the liquidated funds to the Trustee.

*Id.* at 296 (emphasis added).

Objectors liken the facts before the Court to the result under § 541(a)(6) which includes in the bankruptcy estate "proceeds, product, offspring, rents, or profits of or from property of the estate[.]" The Court understands the analogy in principle, but finds the reference misplaced. Section 541 identifies which property becomes property of the estate. Whether the funds distributed from Debtor's OSI 401(k) are exempt and therefore property of the estate is a function Texas-state law, regardless of the principles enunciated in the Bankruptcy Code.

---

[15] "In fact, it seems that at least some of the funds were withdrawn from the IRA before the Hawks filed for bankruptcy (as early as December 11, 2013)." *In re Hawk*, 871 F.3d at 295 n.1.

**F. Debtor's Personal Property**[16]

    **1. Debtor should be afforded a personal property exemption in the amount of $100,000 under subsection 42.001(a)(1) of the Texas Property Code.**

    **a. Factual Findings**

Debtor and LeAnn were married in 1999 and continue to be married as of present. Together, they have four children—a 16-year-old daughter, 13-year-old son, 8-year-old son, and a 3-year old daughter. Debtor's Schedule I represents that he receives $0.00 in income but receives monthly contributions from LeAnn[17] in the amount of $37,150 to pay his monthly living expenses. (ECF No. 1). Debtor has not personally received a salary since April 2017. Presently, Debtor does not pay any of the household expenses and has not done so since April of 2017.

    **b. Parties' Contentions**

Key and the Trustee argue that Debtor's personal property exemption should be limited to $50,000 under subsection 42.001(a)(2) rather than $100,000 under subsection 42.001(a)(1) of the Texas Property Code because Debtor is not head of household. Neither Debtor's Response nor Debtor's Closing Arguments address the merits of this argument.

    **c. Discussion**

Article XVI, section 49 of the Texas Constitution granted the Legislature the power to create statutory exemptions from forced sale for certain portions of personal property for all heads of families and also for unmarried adults. Pursuant to that authority, the Legislature enacted the personal property exemptions enumerated under chapter 42 of the Property Code. Subsection 42.001(a) exempts certain personal property from garnishment, attachment, execution, or other

---

[16] Key's Closing Arguments ask the court to deny claimed exemptions in "Replica figurines, Dallas Cowboys memorabilia and Spurs memorabilia." (ECF No. 223 at 11). No Party objected to these claimed exemptions in the Amended Objections (ECF Nos. 182, 183, and 184). As such, the Court will not address the merits of whether these are properly claimed exemptions.

[17] LeAnn testified that the Cyr family household expenses are paid by the BHT.

seizure if:

> (1)     The property is provided for a family and has an aggregate fair market value of not more than $100,000, exclusive of the amount of any liens, security interests, or other charges encumbering the property; or
>
> (2)     The property is owned by a single adult, who is not a member of a family, and has an aggregate fair market value of not more than $50,000, exclusive of the amount of any liens, security interests, or other charges encumbering the property.

Tex. Prop. Code § 42.001(a).

For purposes of a homestead exemption, Texas Courts use a three-part test to determine whether a homestead claimant is a single adult or the head of a family: "(1) the relation is one of social status, not of mere contract, (2) there is a legal or moral obligation on the head to support the other members, and (3) there is a corresponding state of dependence existing on part of the other members for their support." *Roco v. Green*, 50 Tex. 483, 490 (Tex. 1878). A handful of courts, including one Texas Court of Appeals, have applied the *Roco* test to determine whether a claimant should be afforded the "family" status under subsection 42.001(a) (or a former version thereof). *See e.g.*, *United States v. Coffman (In re Coffman)*, 163 B.R. 766, 768 (N.D. Tex. 1994); *In re Evans*, 25 B.R. 105, 107 (Bankr. N.D. Tex. 1982); *Crow v. Burmeister*, 26 S.W.2d 447, 448 (Tex. Civ. App.—El Paso 1930, no writ). Key advocates that the Court should adopt the *Roco* test under the circumstances, and that application of this test indicates that Debtor is entitled to a personal property exemption of $50,000, not $100,000.

Even if the *Roco* test was the proper inquiry for these purposes, the Court finds that Key's argument lacks merit.[18] Key contends that because Debtor acknowledges and has testified that he

---

[18] The Court takes no position as to whether the *Roco* test is the proper test for purposes of determining whether a claimant is entitled to a personal property exemption of $100,000 afforded to property provide for a family or $50,000 afforded to property owned by a single adult, who is not a member of a family. Tex. Prop. Code § 42.001(a).

receives no income and that all financial support of Debtor, LeAnn, and their children are provided by the BHT, Debtor does not provide the requisite support to satisfy the second prong of the ***Roco*** test.

The ***Roco*** test requires that there be a legal or moral obligation on the head to support the other members. Under the Texas Family Code, spouses have a legal duty to support each other and a parent has a legal duty to support his or her children under eighteen years of age. Tex. Fam. Code § 2.501 ("Each spouse has a duty to support the other spouse" and [a] spouse who fails to discharge the duty of support is liable to any person who provides necessaries to the spouse to whom support is owed[.]"); § 151.001(a)(3) ("A parent of a child . . . has the duty to support the child, including providing the child with clothing, food, shelter, medical and dental care, and education."). The second prong of the ***Roco*** test does not require that the conduct of the parties reflect that legal or moral obligation; rather, the test merely requires the existence of such a duty. Here, on the Petition Date, Debtor was married with four children all of whom were under the age of eighteen. Under the Texas Family Code, on the Petition Date Debtor had, a legal obligation to support both LeAnn as his wife and his four children. As such, the Court finds that the second prong of the ***Roco*** test is satisfied. Key as the objecting party has the burden of establishing that the exemption is not valid, and because the Court concludes that Key's argument lacks merit, the objection on this basis is overruled.

**2. The value of Debtor's personal property exemptions are deemed valid as Key and Trustee did not meet their burden.**

**a. Factual Findings**

Debtor claimed the full value of exempt property afforded by section 42.001 and 42.002 of the Texas Property Code. Specifically, Debtor claimed as exempt household goods and furnishings, clothing, piano, bicycles, a stroller, wedding rings, watches, two firearms, an outdoor swing and

play set, and a basketball hoop. Debtor did not have any involvement in ascribing the values of any property identified on his Schedule C, other than to adopt and use the values assigned to such property by Putman.

Putman valued the personal property at what she termed "liquidation value" and testified that she based the values on her knowledge and experience. Putman explained that she was attempting to get the cash equivalency of the values of the furniture and items in the Cyrs' home. She testified that in determining the appropriate values, she used variables or comparable values from local consignment stores, the internet, and various upscale second-hand stores. Putman testified that there could be differences of opinion between appraisers on the value ascribed to the items in her report. She also stated that as of the date of the hearing should could not give a fair market valuation of the property.

Putman testified that she included appraised all items in 15 Esquire other than items owned by LeAnn and items belonging to the Cyrs' children. Putman testified that at the request of Debtor's counsel, she valued a collection of Spurs' jerseys, basketballs, and action figurines that were in the minor son's bedroom and the daughter's bedroom, along with a student piano used by a minor child. Putman testified that the household furnishings are approximately ten years old and Indonesian made to look elegant but not a collectible. In ascribing those values, she used the values that she sees in a consignment store knowing what an approximate price in her opinion would be at an estate sale. Putman testified that the electronic equipment in the media room (a projector, television, and sound system) was approximately ten years old and obsolete.

### b. Parties' Contentions

Key asserts that the stated method of the valuation offered by Debtor is a liquidation value intended to artificially diminish the claimed value of the property sought to be exempted and therefore Debtor's claimed exemptions should be denied. In other words, Debtor has undervalued

his exempt property. Alternatively, and additionally, Key argues that the exemptions should be denied to the extent that the amount actually listed for each such item in each such category by Debtor is less than fair market value of the subject asset and the Trustee should be permitted to take into the assets of the estate the difference between the listed value and the fair market value. Stated differently, the exemption should be denied in the amount that reflects the difference between the fair market value and listed value and upon reappraisal of the property by the Trustee, all of the value in excess of that set forth in the Putman Appraisal should be property of the estate.

### c. Discussion

For purposes of exemptions, the Bankruptcy Code defines "value" to mean "fair market value as of the date of the filing of the petition [.]" 11 U.S.C. § 522(a)(2). "Fair market value" means "the price which a willing seller under no compulsion to sell, and a willing buyer under no compulsion to buy, would agree upon after the property has been exposed to the market for a reasonable amount of time." *In re Johnson*, No. 11-12778-CAG, 2012 WL 3704835 at *4 (Bankr. W.D. Tex., Aug. 27, 2012 (citing *In re Shurley*, 163 B.R. at 291). To determine fair market value, "the Court must consider the evidence of value produced by the parties and determine the appropriate value." *In re Shurley*, 163 B.R. at 291 (citations omitted). "In making such a determination, 'the Court is not bound by any figure in particular, but merely guided by them all.'" *Id.* (citation omitted).

Here, Debtor valued his personal property exemptions based on the values ascribed in Putman's Appraisal. Key and the Trustee contend that such values are liquidation values and not fair market values and therefore, the exemption should be denied. Key and the Trustee, however, provide no competent evidence that affirmatively demonstrates that a fair market value for Debtor's personal property exemptions is higher than the value claimed by Debtor. "To deny a debtor an exemption which is based upon a dollar limitation, the objecting party cannot carry its

burden of proof by merely impeaching the Debtor's valuation." *In re Johnson*, 2012 WL 3704835 at *4 (citing *In re Shurley*, 163 B.R. at 291). It is not the debtor's burden to prove that the valuations are correct; rather, the burden is on the objecting party to prove by a preponderance of the evidence that such a valuation is inaccurate and, under these circumstances, to conclude otherwise "would be tantamount to shifting the burden of proof to the Debtor[] to prove value." *In re Shurley*, 163 B.R. at 291. Because Key and the Trustee have not met their burden of proof, the objection on this basis is overruled.

Key asks, "additionally and alternatively," to deny Debtor's claimed exemptions to the extent that the amount actually listed for each item in each category by the Debtor is less than fair market value of the subject asset and the Trustee should be permitted to take into the assets of the estate the difference between the listed value and the fair market value. While Key is not clear how this will be accomplished, such a request at this stage in Debtor's bankruptcy case is inappropriate. All of Debtor's creditors had opportunity to object to Debtor's exemptions, which the Objectors did. None of the Objectors, however, have provided competent evidence ascribing a higher value to Debtor's claim of exemptions. Allowing such relief permits the Trustee a second opportunity to evaluate the value of Debtor's personal property and object to Debtor's exemptions.

**G.    The Lincoln Policies are not property of the estate and therefore cannot be exempted in Debtor's bankruptcy.**

**1.    Factual Findings**

On September 12, 2014, Debtor created the Steven Jeffrey Cyr Life Insurance Trust (the "ILIT"), naming LeAnn as the trustee. Also on September 12, 2014, two Lincoln Benefit Life Insurance Policies (the "Lincoln Policies") which were transferred and assigned to the ILIT.

**2.    Parties' Contentions**

Key, the Trustee, and Debtor all agree that the Lincoln Policies are owned by the ILIT, not

41

Debtor, and therefore the Lincoln Policies are not property of the estate and cannot be claimed as exempt in Debtor's bankruptcy. Debtor also contends that the Lincoln Policies are not subject to the claims of creditors.

### 3. Discussion

"Property that is properly exempted under § 522 is (with some exceptions) immunized against liability for prebankruptcy debts." *Owen*, 500 U.S. at 308 (citing 11 U.S.C. § 522(c)). "No property can be exempted (and thereby immunized), however, unless it first falls *within* the bankruptcy estate." *Id.* (emphasis in original). "Section 522(b) provides that the debtor may exempt certain property "from property of the estate"; obviously, then, an interest that is not possessed by the estate cannot be exempted." *Id.*

Here, Key, the Trustee, and Debtor all agree that the Lincoln Policies are owned by the ILIT, not Debtor, and therefore the Lincoln Policies are not property of the estate. Because the Lincoln Policies are not property of the estate, they cannot be exempted under § 522. As such, the Court concludes that the Lincoln Policies are not exempt under § 522.

Debtor also contends that the Lincoln Policies are not subject to the claims of creditors. Whether the Lincoln Policies are subject to the claims of creditors is not before the Court and therefore the Court takes no position on this argument.

### H. Trustee and Key have not met their burden in proving that the VGLI is owned by a third party; therefore, the VGLI is a proper claim of exemption.

#### 1. Factual Findings

Debtor obtained the Veterans Government Life Insurance Policy (the "VGLI") while he served active duty in the United States Military.

#### 2. Parties' Contentions

Key contends that the VGLI is an asset owned by a third party and therefore not a valid claim

of exemption. Debtor contends that Debtor owns the VGLI and therefore the VGLI is a proper claim of exemption.

### 3.  Discussion

Key, as the objecting party, has "the burden of proving that the exemptions are not properly claimed." Fed. R. Bankr. P. 4003(c). "Such burden is by a preponderance of the evidence." *In re Shurley*, 163 B.R. at 291  (citing *Grogan v. Garner,* 498 U.S. 279 (1991)). "If the evidence is such that a decision on point cannot be made one way or the other, the party with the burden of proof loses." *Id.* (citation omitted).

Here, Key has not met their burden. Admitted into evidence is Joint Exhibit 34 which is documentation regarding the VGLI, none of which identifies an owner of the VGLI. The documentation evidencing an election to to participate in the VGLI was completed by Debtor and identifies Debtor as service-member obtaining coverage. There is no evidence identifying anyone other than Debtor as the owner of the VGLI. As such, the Court concludes that Key has not met its burden and therefore, the VGLI is a properly claimed exemption.

### I.  The USAA Policy is not property of the estate and therefore cannot be exempted in Debtor's bankruptcy.

#### 1.  Factual Findings

The USAA Universal Life Policy (the "USAA Policy") identifies LeAnn as the owner of the policy and Debtor as the insured. (Joint Exhibit 34).

#### 2.  Parties' Contentions

Key asserts that the USAA Policy is owned by a third party and therefore not a proper claim of exemption.

#### 3.  Discussion

For the reasons above, because the USAA Policy is owned by LeAnn, and not Debtor, the

USAA Policy would not otherwise constitute property of the estate and therefore is not a valid exemption.

## J. Whether the OSI office equipment and furnishings are properly claimed exemptions is moot.

Key and the Trustee objected to Debtor's claimed exemption in OSI office equipment and furnishings on the basis that the property was not owned by Debtor. Subsequent to the filing of the Objections, Debtor amended his schedules to remove any claimed exemption in these assets. As such, Key and the Trustee's objections to the OSI office equipment and furnishings are moot.

## K. Whether the OSI exercise and fitness equipment are properly claimed exemptions is moot.

Key and the Trustee objected to Debtor's claimed exemption in OSI exercise and fitness equipment on the basis that the property was not owned by Debtor. Subsequent to the filing of the Objections, Debtor amended his schedules to remove any claimed exemption in these assets. As such, Key and the Trustee's objections to the OSI exercise and fitness equipment are moot.

## L. Bad faith is not a proper basis for precluding subsequent amendments to exemptions.

Key and the Trustee ask the Court to deny Debtor any further opportunity to schedule and exempt any community property, whether under the joint control of sole control of the Debtor on the bases that Debtor engaged in bad faith by (1) intentionally concealing assets and (2) undervaluing assets.

A debtor may amend his schedules, including his schedule of exemptions, "as a matter of course at any time before the case is closed." Fed. R. Bankr. P. 1009(a). Prior to *Law v. Siegel*, 571 U.S. 415 (2014), courts permitted liberal amendment of exemption claims unless there was a showing of bad faith, including concealment of property, or prejudice. *Stinson v. Williamson (In re Williamson)*, 804 F.2d 1355, 1358 (5th Cir. 1986) (citing *Doan v. Hudgins (In re Doan)*, 672 F.2d 831, 833 (11th Cir.1982)). In *Siegel*, however, the Supreme Court obliquely overruled prior

44

case law, including the Fifth Circuit case *In re Williamson,* which permitted a bankruptcy court

to deny an amendment to a debtor's exemption based on bad faith or prejudice to creditors:

> [A] handful of courts have claimed authority to disallow an exemption (or to bar a debtor from amending his schedules to claim an exemption, which is much the same thing) based on the debtor's fraudulent concealment of the asset alleged to be exempt. *See, e.g., In re Yonikus,* 996 F.2d 866, 872–873 (C.A.7 1993); *In re Doan,* 672 F.2d 831, 833 (C.A.11 1982) (per curiam); *Stewart v. Ganey,* 116 F.2d 1010, 1011 (C.A.5 1940). He [the trustee] suggests that those decisions reflect a general, equitable power in bankruptcy courts to deny exemptions based on a debtor's bad-faith conduct. For the reasons we have given, the Bankruptcy Code admits no such power. It is of course true that when a debtor claims a state-created exemption, the exemption's scope is determined by state law, which may provide that certain types of debtor misconduct warrant denial of the exemption. *E.g.,* In re Sholdan, *217 F.3d 1006, 1008 (C.A.8 2000).* . . . [F]ederal law provides no authority for bankruptcy courts to deny an exemption on a ground not specified in the Code.

*Siegel*, 571 U.S. at 425. While the issue in *Siegel* dealt with whether a trustee could surcharge a

debtor's exempt property based on a debtor's conduct during a bankruptcy case, this Court joins

at least one other court in this Circuit in construing *Siegel* to preclude courts from disallowing an

amendment to debtor's exemptions based on bad faith or prejudice to creditors. *See In re Saldana*,

531 B.R. 141, 162 (Bankr. N.D. Tex. 2015) ("[T]he court concludes that *Law v. Seigel*,

nonetheless, implicitly overruled prior case law (including the Fifth Circuit's holding in *In re

Williamson* which relied on the Eleventh Circuit's holding in *In re Doan)* that enabled a

bankruptcy court to deny an amendment to the debtor's homestead exemption based on bad faith

or prejudice to creditors.") (citations omitted)). Therefore, because the Court concludes that bad

faith is not a proper basis for disallowing an amendment of schedules, this Key's request to deny

Debtor a future opportunity to amend his schedules is denied without prejudice.

**M. Key does not provide a basis for ordering an inspection of Debtor's property.**

Key asks the Court to direct Debtor and LeAnn to permit the Trustee to conduct a thorough

inspection of 15 Esquire and 30 Post Shadow, inclusive of all safes, closets, drawers and adjacent buildings and inventory all of the personal property located therein. Key also requests that the Court direct Debtor and his non-filing spouse to permit the Trustee to conduct a thorough inspection of each storage unit under the control of the Debtor and/or the Debtor's non-filing spouse wherever located. Key does not explain a reason for such inspection and without more information, the Court cannot properly grant such relief. As such, Key's request for an inspection is denied without prejudice.

## CONCLUSION

For the aforementioned reasons, the Court concludes the following:

1. Debtor did not abandon 15 Esquire because as of the Petition Date, Debtor and his family still occupied 15 Esquire. Likewise, the purchase of 30 Post Shadow did not constitute abandonment of 15 Esquire because while 30 Post Shadow had been acquired, it had not yet been occupied.

2. The Living Trust is not a "qualified trust" under the Property Code and therefore, when 15 Esquire was transferred to the Living Trust, 15 Esquire lost its homestead exemption protections.

3. Debtor's interest in the OSI 401(k) plan is exempt because Debtor had an unconditionally exempted interest in the 401(k) on the petition date.

4. Debtor should be afforded a $100,000 personal property exemption because Trustee's argument that Debtor does not satisfy the *Roco* test is without merit.

5. The values ascribed to Debtor's personal property exemptions are valid because Key and Trustee did not provide competent evidence evidencing that the values should be higher.

6. The Lincoln Policies are not property of the estate and therefore not exempt property for purposes of Debtor's bankruptcy.

7. The VGLI Policy is exempt as Key and the Trustee did not identify anyone other than Debtor as the owner of the VGLI Policy.

8. Whether the OSI office equipment and furnishings are properly exempt is moot because Debtor removed those assets from his Schedule C prior to the hearing.

46

9. Whether the OSI exercise and fitness equipment are properly exempt is moot because Debtor removed those assets from his Schedule C prior to the hearing.

10. Key's request to preclude Debtor from further amending his schedules is denied without prejudice because bad faith is not a proper basis for disallowing an amendment of schedules.

11. Keys request for an inspection is denied because Key does not explain a reason for permitting such inspection.

IT IS THEREFORE ORDERED the Amended Objection of Jose C. Rodriguez, Trustee, to Debtor's Claims of Objections (ECF No. 182) is SUSTAINED IN PART, OVERRULED IN PART, and MOOTED IN PART,

IT IS FURTHER ORDERED THAT First Amended Objections of Key Equipment Finance to Debtor's Claims of Exemptions (ECF No. 183) is SUSTAINED IN PART, OVERRULED IN PART, MOOTED IN PART, and DENIED IN PART.

IT IS FURTHER ORDERED that SNH NS MTG Properties 2 Trust's Amended Objections to Debtor's Claims of Exemptions (ECF No. 184) is SUSTAINED IN PART and OVERRULED IN PART.

### ###